IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE McDONALD-WITHERSPOON, | : | |
| Individually and as Administratrix of the | : | CIVIL ACTION |
| ESTATE OF KENYADA JONES | : | |
| Plaintiff | : | NO.  17-CV-1914-TON |
| vs. | : | |
| CITY OF PHILADELPHIA; ET AL. | : | |
| Defendants | : | |

_____

## PLAINTIFF'S OMNIBUS BRIEF IN OPPOSITION TO ALL FOUR MOTIONS FOR SUMMARY JUDGMENT FILED BY DEFENDANTS

Plaintiff Michelle McDonald-Witherspoon, Individually and as Administratrix of the Estate of Kenyada Jones, through her attorney of record Cristal Law Firm LLC, submits this Brief in Opposition to defendants' four motions for summary judgment.

## MATTER BEFORE THE COURT

Defendants filed a total of four summary judgment motions regarding four sets of defendants: (I) Corizon Health Inc. ("Corizon") and Vivian Gandy MD ("Gandy"), (II) MHM Services Inc. ("MHM"), Deborah Harris-White LSW ("White") and Cheryl Baldwin MSW ("Baldwin"), (III) Amber Browne ("Browne") and Jeanette Palmer ("Palmer"), and (IV) City of Philadelphia ("City") and Gerald May ("May"). The four motions rely on the same set of proposed Statement of Material Facts referred to as the Joint Defense Stipulated Statement of Material Facts ("DSF") and the same set of exhibits referred to as the Joint Defense Appendix ("DA"). Plaintiff will address the DSF in the Response to DSF that follows this Brief. Plaintiff opposes all points of all four defense motions for summary judgment. Plaintiff will rely on this Brief in Opposition, the

Response to DSF and the 41 exhibits attached hereto[1]. Appendix A following this Brief sets forth a

Table and Certification of Exhibits. A form of Order and Proof of Service are also attached hereto.

## COUNTER-STATEMENT OF MATERIAL FACTS

1.      Plaintiff produced expert reports of three experts. Those reports and CVs are attached hereto

as Exhibits 1-3. Plaintiff incorporates these expert witnesses' entire reports into this Statement of

Facts.

2.      Victor Lofgreen, PhD has a long career in law enforcement and found the actions of Browne

and Palmer fell "far outside of the acceptable standards and practices for parole-probation officers.

Their actions grossly violated normal and accepted standards and practices and constituted

deliberate and reckless indifference to the civil rights and serious psychiatric and medical needs of

Kenyada Jones." (Exhibit 1). Dr. Lofgreen cited the fact that Browne and Palmer had Kenyada

Jones arrested and imprisoned, not for violating conditions of parole/probation, but for having a

mental illness – for being a mentally handicapped person. Without psychiatric training or licensure,

Browne and Palmer took it upon themselves to make psychiatric decision, which had disastrous

consequences.

3.      Plaintiff's psychiatry expert Gregory P. Brown MD found that Baldwin, White and MHM

acted with deliberate indifference to the psychiatric needs of Kenyada Jones, that the lack of proper

care went beyond mere negligence. The MHM defendants were confronted with acute psychotic

symptoms, had knowledge of inadequate dosages of antipsychotic medications. White and Baldwin,

despite this, did not refer Kenyada to see a psychiatrist, did not admit him to the psychiatric ward of

the prison (next door), did not place a No KOP order on his medications, did not obtain records of

his recent psychiatric hospital admission, did not speak to his parole officer who had sent him to

---

[1] Due to the size of the exhibits, they will, for the convenience of the Court, be uploaded to the Court's docket only
once, though they will be relied on in all four oppositions to the four motions.

prison due to his acute psychotic breakdown. (Exhibit 2). MHM did nothing to address his severe, acute schizophrenic crisis, but instead gave him every opportunity to kill himself.

4.     Plaintiff also submitted expert reports by Bonnie Nowakowski, DO, a doctor who works in a federal prison as a general practitioner for inmates, in the exact same setting as Gandy/Corizon. She was likewise appalled by the deliberate indifference of the CFCF medical and psychiatric staff. She cited the CFCF medical personnel's failure to address obvious signs of "acute confusional state or delirium in a patient at high risk for suicide attempt." Dr. Nowakowski mentioned Gandy/Corizon's deviation from accepted standards of medical practice; their knowledge of Kenyada's high risk of serious harm; and their decision to give him a whole blister-pack (a month's supply) of pills and leave him alone in a single jail cell in general population, despite his being in an acute psychotic state of delirium, leading very foreseeably to his overdose. (Exhibit 3). Kenyada, due to his condition, could not think rationally. No one would think of giving a person in that condition a whole bottle of pills and put him alone without monitoring.

5.     Plaintiffs also submit a manual from the Administrative Office of the United States Courts on Probation Procedures. This provides further guidelines for correct action by parole officers. One point the manual makes is in Chapter 3, Section 2(D)(2)(p), that when confronted with a parolee at risk of harming himself or others, the parole officer should implement strategies including "notifying the local mental health crisis unit or local police department for a health and welfare check (e.g., to assess for emergency mental health commitment) notifying the treatment provider…" This is the appropriate reaction to the situation: call in a professional to assess the need for emergency mental health commitment. (Exhibit 4). This was obviously what should have been done. If they did not feel like waiting for Kenyada's mother to arrive to take her son to the hospital, then they should have at least called in EMS or the police or other services to come and evaluate

Kenyada. They could have committed him back to the psychiatric hospital where he had been admitted days earlier. To arrest him and toss him in jail was quicker and easier for Browne and Palmer, but for Kenyada it exacerbated his acute psychotic symptoms and ended in his death by overdose of pills in a jail cell.

6.      Plaintiff submits the letter report of Raymond F. Patterson MD of December 2015, a few months before Kenyada's death. Dr. Patterson evaluated the extensive and ongoing problems at CFCF regarding failure to meet inmate's medical/psychiatric needs. He cites pervasive problems of delay in evaluation of inmates showing serious psychiatric symptoms, and of lack of communications and coordination between MHM (psychiatric healthcare) and Corizon (general overall healthcare and medication prescriber). These are the problems that led to Kenyada's death. MHM did not tell Corizon "No KOP"; Kenyada was not seen by a psychiatrist who could adjust his medications; Kenyada was not sent to the psych ward next door to receive special monitoring and care. Dr. Patterson expresses serious concerns about MHM and Corizon's lack of timely evaluations and treatment plans for inmates in need of attention, including medication review appointments, which Kenyada never got and which proved to be a deadly omission of standard care of a patient on psychotropics. (Exhibit 5, see, e.g., p. 14).

7.      Dr. Patterson returned to CFCF in September 2016, shortly after Kenyada's death. Dr. Patterson complained of continuing problems in MHM staff's "borrowing" information from prior evaluations instead of performing a true and complete evaluation each time. MHM promised last time to stop this dangerous practice, but nonetheless it continued. (Exhibit 6, see, e.g., p. 7). MHM and Corizon took the easier route to 'borrow' Kenyada's prior answers/evaluations, and it led to a wrong analysis and poor care plan.

8.     Even the Pope, leader of the Roman Catholic Church, was taken aback by the conditions and lack of care of inmates at CFCF. This is a man who spent his life studying the infernos of hell, and he was shaken by the "gruesome and harrowing conditions" at CFCF. (Exhibit 7).

9.     Kenyada was at CFCF in February 2016 for a DUI arrest, due to not making bail and a detainer. He got out in early June 2016, only to be sent back by Browne and Palmer on 6/28/16. On 2/3/16, Kenyada was evaluated by MHM staff who noted findings including: past psychiatric hospitalizations; his report that "I became really sick with paranoia suicidal thoughts"; and findings that he had prior suicide attempts by overdose on prescription medications:

> "Prior suicidal/self-injurious behavior:  Yes… 1) OD [overdose] pills -ambien-1993 2) OD – psych meds – 1996 (Hospitalized for both attempts)." (Exhibit 8).

10.    On 2/4/16, Gandy evaluated him and placed him on Amlodipine Tablets, 10 mg, once a day 90 tablets (three months worth), for his high blood pressure. (Exhibit 9).

11.    The medication flowchart shows he was given Amlodipine [brand name: Norvasc] starting on 2/3/16. (Exhibit 10).

12.    On 2/29/16, Corizon put in a "No KOP" order, whereby due to Kenyada's mental condition he was not permitted to keep medications on his person, for his own safety, i.e., he was not allowed to have the whole bottle/blister-pack of pills in his jail cell, but instead he must be handed out his medication one pill at a time. (Exhibit 11, p. 2, under 'Routine Intervention').

13.    On 3/2/16 he was specially assessed for high blood pressure and prescribed the Amlodipine. (Exhibit 12).

14.    There is much damning evidence in this case, but if there must be one 'smoking gun' it is Exhibit 13. This is the Medication Flowchart for 3/3/16, and beside the Amlodipine is the notation in large, bold letters:

> "NO KOP   NO KOP   NO KOP   NO KOP"

This Medication Flowchart entry is ascribed to none other than defendant Gandy of Corizon.
(Exhibit 13).

15.     Corizon's Progress Notes of 4/21/16 and 4/22/16 continue the No KOP order. (Exhibits 14,
15).

16.     MHM's Progress note of 5/6/16 states an assessment of "Schizoaffective disorder,
subchronic with acute exacerbation." It states that Kenyada thinks others are trying to hurt him and
endorses paranoia. The No KOP order is restated. (Exhibit 16).

17.     Kenyada was transferred to a different facility on 5/26/16. The transfer order states clearly
and unambiguously "Is the inmate on Keep-On-Person (KOP) medications? No. No KOP." (Exhibit
18). This is one month before his return to CFCF.

18.     On 6/3/16, less than a month before his overdose on Amlodipine, Corizon's doctor orders:
"NO KOP for amlodipine" of which he receives 30 pills per month. (Exhibit 18).

19.     On 6/7/16, three weeks before his return to CFCF, MHM evaluates him as "Schizoaffective
disorder, subchronic with acute exacerbation" and restates his No KOP order. (Exhibit 19).

20.     On 6/12/16, twenty days before his death from self-administered overdose, the psychiatric
social worker at MHM sees him for an "urgent referral and reporting increased anxiety and
paranoia." The MHM evaluator states that "Inmate must be on 1:1… Emotions Appear: Depressed,
Anxious, Extreme change (in mood), Easily tearful, Suspicious or paranoid, Confused or
disoriented." The evaluation further states that when asked about Prior suicidal/self-injurious
behavior and ideation he is unable or unwilling to answer; and that he has had "numerous 201
[voluntary psych commitment] and 302 [involuntary commitment] admissions in the community."
He also exhibited "non linear thought processing and poor eye contact." (Exhibit 20).

21.     On 6/16/16, less than a week after his release from CFCF, Kenyada was admitted for six

days to Friends Hospital a psychiatric hospital in Philadelphia. He suffered from increasing

paranoia, feeling like the whole community was following him, increased depression; he felt

hopeless, had decreased interest in life, was hearing voices, looked disheveled, and most

significantly:

> "Suicidal ideations positive with plan to overdose on pills… Auditory hallucinations
> positive 'harm myself'. Mood depressed. Affect blunted. Insight and judgment
> poor."

His psychiatric diagnoses on his 6/22/16 discharge included unspecified bipolar disorder and

psychosis. (Exhibit 21).

22.     Plaintiff submits the daily logs from his parole-probation officers. These are in reverse

chronological order and cover the 6/28/16 meeting between Kenyada and his parole officer Browne

and her supervising parole officer Palmer. The notes document that Kenyada was having a

psychotic meltdown and needed to be 302'd; he needed to be committed to a psychiatric hospital.

But bizarrely, the parole officer states in the logs that attempts to 302 him "could not be done." At

deposition, the parole officers could not explain that note or why it "could not be done." In fact, the

parole officers could and should have 302'd him, but made no attempt to 302 him. His mother was

on her way to the parole office to come take him to the hospital either voluntarily or involuntarily.

The parole officers just needed to wait a few more minutes for his mother to get there; or they could

have called in EMS or local police to perform a site 302 evaluation, as recommended by the parole

procedures manual, or they could have simply let him go as he requested. But instead they decided

to send him to prison. Browne claimed she tried to tell the prison about Kenyada's emergency

psychiatric and medication needs, and emailed Mary Jane Rule, an MHM employee, but did not call

or visit or follow up to see if anyone got her message, and no one did, and Kenyada did not receive needed psychiatric care. (Exhibit 22).

23.     Kenyada did not violate any conditions of parole, even according to defendants. He merely spoke of going to NY to visit his brother, he made no attempt to actually go there. Defendants claimed at deposition that he could cause harm by driving a defective vehicle—a vehicle they told him to move and which was anyway disabled. It is strikingly odd that defendants, in the middle of the meeting, told Kenyada to re-park his car, which was parked outside the office, and then a whole crew of parole officers (even those having no connection to the case) followed him downstairs to "witness" him driving the vehicle that they told him to drive, then using that as their reason to claim he was a danger (i.e. driving erratically). This was a misdirection by defendants. It is not believable that a parole officers would arrest and imprison a parolee because of the possibility that he might later drive a car that needs maintenance. Clearly, defendants wanted to get this 'crazy' person out of their hair as soon as possible and took the easiest route, which was to send him to prison. In truth he was sent to prison for having a mental disability. (Exhibit 22).

24.     Upon his return to CFCF on 6/28/16, Kenyada went through intake evaluation. Beside "Do you have any life threatening medical problems?" it is checked Yes and also checked No. (Exhibit 23).

25.     Intake ordered an urgent psych referral due to Kenyada appearing agitated with extreme change (in mood), being afraid of others for no reason, confused and disoriented, displaying bizarre behavior, talking to himself. (Exhibit 24).

26.     On 6/28/16, Gandy performed an evaluation of Kenyada. Gandy was informed that Kenyada had just recently been in Friends psychiatric hospital; she found him to be anxious and afraid. She noted diagnosis of schizophrenia, manic depression, mood swings. He told her that he "has cancer

spread all over him… multiple boils…" Gandy could plainly see that he was either seriously delusional or had an emergency medical crisis. Yet she took no steps to address these problems. (Exhibit 25).

27.     On 6/28/16 through 6/29/16, despite all of the above signs and symptoms and medical history, Gandy did not order or recommend that he be sent to an outside hospital for evaluation, or that he be housed in the prison hospital/psychiatric ward next door, or that he be in a multiple person cell, or that he receive additional monitoring, or that he be seen by a psychiatrist, or that his medications be given on a "NO KOP" basis. She requested none of the above. She did not look at the prior CFCF records showing prior suicide attempts and NO KOP orders. She did not try to obtain the Friends Hospital records showing that one week earlier he had been admitted for suicidal ideation and plan to overdose on pills. She did not make sure he was getting his psychotropic medications or that they were at the correct dosage. She did not talk to his parole officer to see why he was sent to prison without violating terms of parole. She did not check the emails for messages from the parole officer.

28.     On 06/29/16, Gandy wrote an order for Amlodipine once a day for 90 days --- without a "No KOP" order; meaning she ordered him at least 30 days' worth of Amlodipine to keep on his person while alone in his jail cell. This comes despite the fact that less than a month earlier, he was still on longstanding NO KOP status at CFCF; the only intervening event being his admission to a psychiatric hospital for suicidal ideation. (Exhibit 26). This would be shocking to the conscious of anyone, especially someone with a medical license.

29.     On 6/29/16, Kenyada was seen by MHM's psychiatric social worker Baldwin on an urgent psychiatric referral. She notices his inconsistencies in his self-reporting. She notices he is manic. Beyond that her evaluation is a mere "borrowing" of the evaluation from the day before. Like

Gandy, she makes no effort to help this person in serious danger of hurting himself. She does not recommend he see a psychiatrist, or go to a hospital, or go to the psych ward, or get extra monitoring, or be in a multi-person cell, or receive a NO KOP order. She ignores the serious risk of self-harm in front of her eyes. (Exhibit 27).

30.     And so, perhaps the second 'smoking gun' is Exhibit 28 – the Medication Flowchart for 7/1/16. Something very important is missing from the document: the "NO KOP" directive; this phrase does not appear on this document. The medication is being given KOP. The document shows the distribution of a month's supply of Amlodipine, the lethal dose, which is handed to Kenyada to take back to his cell where he will be alone with his thoughts; this comes only ten days after he was admitted to a psychiatric hospital for having a plan to commit suicide by overdosing on pills – facts verified by the records then existing. (Exhibit 28).

31.     The final day of Kenyada's life, leading up to the overdose, was quite eventful. It was the prison guard watching Kenyada who sent him for an emergency psychiatric referral due to Kenyada's bizarre behavior: Kenyada tried to "flood his cell" and had made "irrational statements" and stayed alone in his cell the whole day. He had no cellmate at that time; his prior cellmate had left due to Kenyada's constant complaining about his bladder. Kenyada also that last day submitted or tried to submit an inmate D-form, an insurance form asking to give money to his family, i.e., he in his delusional state was trying to write out a will and/or take out a life insurance policy on himself. (Exhibit 29).

32.     Despite all these warning signs, and past history and the psychotic crisis and danger of self-harm, MHM psychiatric social worker White evaluated him on 7/2/16, a few hours before his overdose and death; and Harris did absolutely nothing for him; she simply sent him back to his jail

cell alone in general population with his blister-pack of pills, with no instructions to anyone. (See Defendants' Joint Exhibit T).

33.     Because defendants placed Kenyada in general population, in a cell by himself, and gave no instructions for monitoring him, the CFCF guards made a serious mistake—they failed to follow the prison policy to check each cell every halfhour. Instead, they went a full hour without checking on Kenyada – and when they finally checked on him, it was too late – he had taken the entire blister-pack of Amlodipine and was on the floor dying from toxic shock, taking his last breaths. They coded him but it did not work and he died on the floor of his prison cell on the afternoon of 7/2/16. (Exhibit 29).

34.     An autopsy was performed by the Philadelphia County Medical Examiner Khalil Wardack MD. He determined the cause of death to be "excess amlodipine intake" with an Amlodipine level of 280 ng/ml (effective level being 2 to 25 ng/ml), eleven times the highest recommended dosage, leading to cardiac arrest. (Exhibit 30).

35.     Kenyada's certificate of death reiterated the cause of death as "Amlodipine toxicity" resulting in "Hypertensive cardiovascular disease." (Exhibit 31).

36.     CFCF's prison policy and procedure for the KOP medication states that KOP cannot be given in PHSW (the prison's psychiatric ward). Had defendants placed Kenyada in the psych ward, he would not have gotten a month's supply of pills to self-administer. (Exhibit 32).

37.     The aforementioned KOP program policy of CFCF is wholly insufficient, as it fails to provide reasonable guidelines for determining when a NO KOP order is appropriate. The policy, had it been a reasonable policy, would have put in place a system to prevent a case like this, where a person is on "NO KOP" one day and off it the next without any change in condition, based simply

on a medical provider being too lazy to look back in the chart. Given its importance, there should be a policy to flag NO KOP patients so that future evaluators are aware of this prior determination.

38.     Defendant Gerald May was the warden of CFCF at the time of Kenyada's death. He admitted he is responsible for CFCF as its warden. He admitted that the prison psych ward (PHSW), where extra attention is given to mentally ill inmates, is right next door to CFCF. He also admitted that where an inmate is waiting for an urgent evaluation, and that there is no extra or special monitoring provided to inmates in general population (where Kenyada was). May testified that Corizon is responsible for deciding KOP versus NO KOP; that MHM and Corizon have equal access to each other's notes and records. May also testified that the parole officer could easily have contacted MHM and Corizon by simply calling up the prison. Browne and Palmer failed to do that; Browne sent an email to one person and got no response, and made no attempt to call or make sure Kenyada received the needed care. (Exhibit 33, p. 9, 17-27, 30-31, 34, 38-45).

39.     Prison guard Jermaine Burke testified that he gave the D-form (the "last will and testament" or "life insurance application" Kenyada created) to his (Burke's) supervisor at CFCF. (Exhibit 34, p. 48).

40.     Burke also testified he found the empty blister-pack of Amlodipine on the floor of Kenyada's cell next to his body. (Exhibit 34, p. 27-28).

41.     Prison guard Gregory Ballard testified about Kenyada flooding his own jail cell which led to his emergency psych referral by a prison guard on 7/2/16. He also testified that Kenyada was lying in his jail cell and died due to an overdose of pills administered by CFCF. (Exhibit 35, p. 17-18, 87).

42.     White testified that emergency referrals must be done immediately and urgent referrals must be done within 24 hours. White testified that part of the reason for the emergency referral was that he had failed to receive his antipsychotic medications. This was 7/2/16 and he had been at CFCF

without his medications since 6/28/16. Yet White sent him back to his general population cell without making sure he received his medication, and without referring him to a psychiatrist to address the dangerous situation of a psychotic being deprived of his antipsychotic medications. White knew or should have known about the prison guard's report of Kenyada's bizarre behavior in the morning of 7/2/16. (Exhibit 38, p. 14, 30-33).

43.     White testified that she should have looked at prior records for history of suicide attempts or ideation. Had she done that she would have seen that there was a prior suicide attempt by overdose noted in the 2/3/16 progress note. Had she checked his Friends Hospital records, she would have seen his suicide plans noted a week earlier. (Exhibit 38, p. 41, 62).

44.     White testified that MHM does not get involved in the decision over KOP versus NO KOP; that is the responsibility of Corizon.—in direct contrast to Gandy/Corizon's testimony. (Exhibit 38, p. 73).

45.     Baldwin testified that there is no extra monitoring given to inmates in general population when they are awaiting an urgent psychiatric referral. Baldwin testified that all Corizon and MHM staff had instant access to all CFCF prior medical records and, by making a simple request, could get access to records of outside medical providers. None of the MHM staff requested or attempted to get the Friends Hospital records. Baldwin or any MHM social worker could have made a referral for immediate evaluation by a psychiatrist; psychiatrists are always available at CFCF, yet no one requested that. (Exhibit 39, p. 26-30, 42-50, 58, 60-61).

46.     Gandy testified that MHM is responsible for determining KOP versus NO KOP status of inmates. (Exhibit 40, p. 49-57). This contradicts the testimony of MHM defendants.

47.     It appears that there were no clear guidelines at CFCF as to who or what staff is responsible for the determining KOP versus NO KOP for an inmate. This issue is of extreme importance, yet the CFCF policy is insufficient to allow for orderly addressing of this issue.

48.     Gandy's decision to not issue a NO KOP order on 6/29/16 is due to her ignoring serious warning signs in Kenyada's CFCF and Friends Hospital records. It was extremely reckless for Gandy to not review Kenyada's medical records, given that he was there at CFCF, per his parole officer, as a substitute for being admitted to a psychiatric hospital to address the high risk of him harming himself. (Exhibit 40, p. 44, 49-57, 77-79, 98-103).

49.     Browne, who sent Kenyada to prison because she thought he needed to be admitted to a psychiatric hospital, has no license to practice psychiatry. She has no education or training in psychology or psychiatry. Yet she is making the most important psychiatric decisions for seriously ill parolees. Her testimony confirmed that she sent Kenyada to prison as a substitute for a psychiatric hospital; that she sent him to prison for having a mental disability. (Exhibit 41).

50.     Browne testified she thought Kenyada should have gotten psychiatric care and that it was a bad idea for him to go to a prison, but that her supervisor Palmer forced her to put Kenyada in prison. (Exhibit 41, p. 218-219).

51.     Plaintiff Michelle McDonald-Witherspoon testified that she spoke with Browne during the meeting with Kenyada. She said she was on her way to the office to take her son to the hospital to get help. Browne said she would wait for her to get there. But Browne went back on her word and, running out of patience, instead had Kenyada arrested and taken to jail minutes before Michelle arrived at the office. It was shocking to Michelle why Browne would do such a thing, locking up a suffering schizophrenic which any rational person knows is the worst thing to do to a paranoid person. (Exhibit 36-37).

52.     Michelle testified that the vehicle in question was safe to drive. (Exhibit 36, p. 180).

53.     Michelle testified that she 302'd Kenyada a number of times in the past. (Exhibit 36, p. 191-201).

54.     The Parole Department spokesperson was stymied and could not explain why Browne and Palmer would send Kenyada to prison instead of opting for psychiatric placement. (Exhibit 37).

55.     Michelle testified about Kenyada's work and income history, that he contributed to household finances and made income through SSI due to a significant work history. (Exhibit 36, p. 87-90).

## LEGAL ARGUMENT

Defendants are bringing motions for summary judgment. Federal Rule of Civil Procedure 56 sets forth the summary judgment standard. The rule provides that summary judgment should only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A court's summary judgment inquiry "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). Rule 56 "is not unfailingly rigid." United States Dep't. of Housing and Urban Affairs v. Cost Control Mktg. & Sales Mgmt. of Virginia, Inc., 64 F.3d 920, 926 n.8 (4th Cir. 1995). "Evidence appropriate for summary judgment need not be in a form that would be admissible at trial … Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." Celotex Corp., 477 U.S. at 324. See also Global Policy Partners v. Yessin, No. 1:09cv859, 2010 WL 675241, at *6 (E.D. Va. Feb. 18, 2010) ("It is clear that evidence not in a form admissible at trial

may nonetheless be considered in summary judgment."); Lorraine, 241 F.R.D. at 537-38. A

"nonmoving party could defeat summary judgment with materials capable of being reduced to

admissible evidence at trial." Cost Control Mktg. & Sales Mgmt. of Virginia, Inc., 64 F.3d at 926

n.8 (citing Celotex, 477 U.S. at 327).

I.      NEGLIGENCE/MEDICAL MALPRACTICE OF CORIZON & MHM:

Corizon and its employee Gandy were the medical providers at CFCF responsible for

Kenyada Jones's overall medical care. MHM and its employees Baldwin and White were

responsible for Kenyada's psychiatric care at CFCF. Plaintiff's psychiatric expert Dr. Brown and

family doctor expert Dr. Nowakowski found that MHM and Corizon violated the accepted

standards of medical care applicable to their fields. (Exhibits 2-3).

For the reasons stated in the above Counter-Statement of Facts, the MHM and Corizon

defendants are liable for medical/psychiatric malpractice and negligence. They failed to follow (in

Gandy's case her own order) the prior records directing NO KOP. They were confronted with an

acutely ill man, who had just been in and out of a psychiatric hospital, who was making delusional

statements. Yet they did not take very easy steps that would have saved his life—they did not place

him in the psych ward, they did not refer him to a psychiatrist, they did not send him to a hospital,

they did not put a NO KOP order in place. All these mistakes led to Kenyada Jones's death from

overdose of the medication given to him by defendants.

Plaintiff's experts in their opinion reports set forth the appropriate standard of care.

Defendants' Briefs complain about the reports and allege they do not specifically say "XYZ is the

standard…" Defendants' point is incorrect. There is no specific magic words or language an expert

must say in the expert report. The appropriate standard of care can be gleaned, known and inferred

from the experts' statements in their reports. The applicable standards of care are clearly understood on a fair reading of plaintiff's expert reports.

II.   DELIBERATE INDIFFERENCE §1983 OF CORIZON, MHM DEFENDANTS

This case involves complete indifference to serious risk of harm, much more than mere negligence. The cases relied on by defendants involve simple mistakes, slip-ups, little 'oops' moments, momentary stumblings. Our case to the contrary involves mind-boggling neglect of duties. Kenyada Jones was a paranoid psychotic having an acute episode, specifically sent to prison to get emergency psychiatric treatment, discharged days earlier from a psychiatric hospital where he had been admitted for suicidal ideation and plan to overdose on pills, and defendants put him alone in a jail cell in general population with a month's supply of prescription medication. Kenyada's CFCF medical chart starting from March 2016 and continuing to his release in early June 2016, stated over and over again that he was NOT to be given a month's supply of medication because of his mental condition, that he was on NO KOP status.

The prison guards themselves sent him for emergency psych eval for his crazy behavior on the morning of his death, flooding his cell, making irrational statements, filling out a childlike will or life insurance application. During his evaluations on 6/28/16 he complained of cancer and boils all over his skin, though the evaluators could clearly see he had no such thing.

Had defendants looked back in his CFCF chart, which was immediately available to them, they would see he had a No KOP order in place. Defendants did not bother to find out why he had just been admitted to a psychiatric hospital days earlier, or why his parole officer had sent him to prison without any new arrests or parole violations; they did not check their emails for urgent messages from his parole officer; they did not evaluate his psychotropic medications to see if they were at the correct levels; they did not make sure he was actually receiving his psychiatric

medications; they did not send him to the psych ward next door for his own safety; they did not refer him to a psychiatrist; they did not put in place a No KOP order despite the history of suicide by overdose attempt. Kenyada was heading towards disaster and Corizon and MHM staff ignored him and did what was easiest for them: toss him back to general population without even instructions for the guards to watch him closely, without saying to the prison guards, "make sure you follow that 'monitor every halfhour' rule this time."

Kenyada Jones is dead because the people at Corizon and MHM ignored the obvious signs of crisis. This was not an 'oops' moment, as the defense attorneys argue. This was a prison staff that engaged in outrageous indifference to a man heading straight toward his grave.

"The plaintiff claims Watson was deliberately indifferent to the serious risk that Scarpi would commit suicide because the Jail… **had a practice of routinely denying detainees with mental health problems access to mental health professionals and suicide-proof cells**….A local governing body… can be liable under § 1983 if (1) it had an express policy calling for constitutional violations, (2) it had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law or (3) if a person with final policymaking authority for the county caused the constitutional violation. *Monell*, 436 U.S. at 694; *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000)…. Here, the plaintiff has alleged that the policies — including the policy to have no policy — and widespread practices of the St. Clair County Sheriff's Department listed above were the moving force behind the failure to protect Scarpi from the known risk of suicide in the Jail. This is sufficient to state a § 1983 claim under *Monell* for deliberate indifference to a detainee's safety needs." <u>*White v. Watson*</u>, 2016 U.S. Dist. LEXIS 149111, 2016 WL 6277601.

"The principal theory of the complaint in *Partridge* was that the boy's death was 'caused by the detention center's custom or policy of allowing jail procedures that are callous to the point of deliberate indifference to detainees, especially detainees in need of protection from injuring themselves or others.' *Id.* at 1185. The court held that "to the extent that the claim rests on the detention center's deliberate and systematic lack of adequate care for detainees, it alleges the kind of arbitrariness and abuse of power that is preserved as a component of the due process clause...." *Id.* at 1187…. [T]he employees of the defendant company failed to properly complete intake forms for the decedent at the jail; failed to review the decedent's medical records prior to making treatment decisions; and failed to act on the decedent's repeated threats of suicide, including by failing to ensure that the decedent saw a qualified mental health professional in a timely fashion." *Thompson v. Ackal*, 2016 U.S. Dist. LEXIS 47154.

"Plaintiffs assert that the fact that the Jail staff ignored the County's suicide prevention Policy by accepting inmates' denials of suicidal thoughts at face value demonstrates that Jail employees were not properly trained on how to implement the official Policy or how to recognize suicidal tendencies. Plaintiffs argue that evidence of the many attempted suicides and the two successful suicides from 2002 until 2010 show that the County knew that its staff were ignoring the Policy. See Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 393 (8th Cir. 2007) ("[T]he need for a particular type of training may be obvious where jailers face clear constitutional duties in recurrent situations.") (quoting Young v. City of Augusta, 59 F.3d 1160, 1172 (11th Cir. 1995)) (emphasis in Szabla); Wever, 388 F.3d at 608 ("In some circumstances, one or two suicides may be sufficient to put a sheriff on notice that his suicide prevention training needs revision."). Plaintiffs conclude that providing an initial staff training on suicide prevention and then an annual refresher on suicide prevention to staff is clearly not sufficient if

the Policy is blatantly ignored….Viewing the evidence in the light most favorable to Plaintiffs, despite having a valid Policy, the Jail experienced multiple suicide attempts and two successful suicides by persons with suicide red flags who were not referred for further evaluation based solely on their own failure to self-report. Additionally, Heacock testified that, despite undergoing the Jail's required training, he would only refer inmates for further evaluation if they self-reported suicidal thoughts. From these facts, a jury could infer that the County's training was inadequate; the County was deliberately indifferent in failing to revise its training; and this inadequate training caused Plaintiffs' injury." _Holscher v. Mille Lacs County_, 924 F. Supp. 2d 1044, 2013 U.S. Dist. LEXIS 17789, 2013 WL 588717.

"Corizon may be liable for harm to persons incarcerated "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." _Fromer v. Corizon, Inc._, 54 F. Supp. 3d 1012 *, 2014 U.S. Dist. LEXIS 147823.

"This case reflects a common scenario: an institution "structured its affairs so that no one person was responsible for [the inmate's] care," and such diffused responsibility can make it very difficult to show individual responsibility for health care failures. _Shields_, 746 F.3d at 795; see also _Glisson_, 813 F.3d at 666 (majority opinion) (divided panel decision, now vacated, on whether private corporation contracting to provide health care for prisoners had policy amounting to deliberate indifference to prisoners' health). Daniel contends instead that the delays and confusion that caused his injury were caused by systemic problems in the health care system for the Cook County Jail that reflect deliberate indifference to inmates' health needs as a matter of official custom, policy, or practice." _Daniel v. Cook Cnty._, 833 F.3d 728  2016 U.S. App. LEXIS 14886, 101 Fed. R. Evid. Serv. (Callaghan) 170.

"The evidence in this case, taken as a whole, permits a finding that Corizon has developed a policy, custom, or practice that resulted in deliberate indifference toward the serious medical need and substantial risk of serious harm involved in this case. This conclusion is based on multiple possible findings, including that there were shocking failures to step-up intervention to adequately address Galambos's persistent decline into psychosis and related self-injurious behavior….that there was and is a belief within Corizon that the individual constitutional right to be free from forced medication without due process justifies a prison policy of permitting a psychotic inmate with a history of suicide attempts to refuse medication even as he succumbs to psychosis and determined suicidal behavior….These possible findings are sufficient to demonstrate a policy, custom, or practice that was directly linked to the deprivation in question." _Cady v. Cumberland County Jail_, 2013 U.S. Dist. LEXIS 109195.

III.   PARTICULAR VULNERABILITY TO SUICIDE

Plaintiff does not concede that this theory applies to these facts. But even if that theory is applied, the facts meet the threshold. MHM argues there was no particular vulnerability to suicide. This argument is belied by the exhibits attached, specifically the Friends Hospital records.

There is no separate standard between a jail suicide or other medical neglect in prison. "In _Farmer v. Brennan_, 511 U.S. 825, 836, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994), the Supreme Court explained that the term deliberate indifference falls somewhere along the legal culpability spectrum between the concept of ordinary negligence and purposeful or knowing conduct. Adopting a subjective test for deliberate indifference, the _Farmer_ Court held that the concept requires that the "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." _Id._ at 837. _See_

*Urrutia v. Harrisburg County Police Dept.*, 91 F.3d 451, 456 (3rd Cir. 1996) (citation omitted) ("Deliberate indifference means that an official acted or failed to act despite his knowledge of a substantial risk of serious harm."). However, neither the Supreme Court nor the Third Circuit has defined the term reckless indifference. In *Williams v. Borough of West Chester*, 891 F.2d 458, 464 n.10 (3rd Cir. 1989) (citation omitted), the Third Circuit stated that "we have not attempted to draw distinctions among terms like 'reckless indifference,' 'deliberate indifference, ' 'gross negligence,' or 'reckless disregard' in this context. We decline to do so in this opinion and will, therefore, use the term 'deliberate indifference' to refer to the type of conduct or state of mind described by these terms collectively." In *Colburn II*, the Third Circuit again declined to define reckless indifference in the context of a prison suicide case, choosing instead to state that: A higher level of culpability, one involving "reckless or deliberate indifference," is required  In Colburn I, we referred to "reckless indifference" as the standard for judging the defendant's conduct. In Williams, we referred to "deliberate indifference." Both panels expressly declined to distinguish or precisely define these two concepts. We find it unnecessary to do so in this case. It will suffice for present purposes to note that a level of culpability higher than a negligent failure to protect from self-inflicted harm is required and that this requirement is relevant to an evaluation of the first two Colburn I elements as well as the third. [*Colburn II, supra*, 946 F.2d at 1024]. The Court does not find it necessary to define reckless indifference in the context of a section 1983 action, although other courts have done so. *See, e.g., Medina v. City and County of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992) (citation omitted) (stating that "reckless intent is established if the actor was aware of a known risk or obvious risk that was so great that it was highly probably that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences"); *Redman v. County of San Diego*, 942 F.2d 1435,

1449 (9th Cir. 1991) (en banc) (defining reckless indifference as conduct which is "so reckless as to be tantamount to a desire to inflict harm"), *cert. denied*, 502 U.S. 1074, 117 L. Ed. 2d 137, 112 S. Ct. 972 (1992). It will suffice to note that the concepts of deliberate indifference and reckless indifference are practically indistinguishable, and, in the present case, any difference is inconsequential to the Court's decision because the alleged conduct of the Low-Level Employees amounted to no more than ordinary negligence which is less culpable conduct than either deliberate or reckless indifference." Estate of Cills v. Kaftan, 105 F. Supp. 2d 391 *, 2000 U.S. Dist. LEXIS 10343.

## IV.    PRIVATE STATE ACTORS CAN BE VICARIOUSLY LIABLE UNDER §1983

Plaintiff maintains the position that MHM and Corizon, as private corporations, can be found liable under respondeat superior for the §1983 violations of Gandy, Baldwin and White. Provision of medical and psychiatric care is an act normally performed by a private entity. §1983 applies because Kenyada was forced to use the medical services of MHM and Corizon by the power of the state to keep him incarcerated.

## V.    POLICY, CUSTOM & PRACTICE OF CORIZON, MHM & CITY

Defendants MHM, Corizon and City are liable under a *Monell* theory of custom and practice and policy. The acts of Gandy, White and Baldwin, and their testimony explaining those acts, indicates that they did what they did in accordance with the policies and the customs at CFCF. The reports in Exhibits 5-6 show the ongoing problem at CFCF. The KOP medication program violated Kenyada's civil rights—it failed to set forth a viable procedure for determining and labeling inmates as KOP or NO KOP. Kenyada was clearly NO KOP from March to June 2016, then when he returned on 6/28/16, he was suddenly KOP – without any analysis of factors to support such a

change. In fact, due to the facts in the records, there was even more reason for him to be NO KOP on 6/28/16 than there was previously.

The customs and policies at CFCF caused Kenyada's death: the staff by policy and custom does not send inmates to the psychiatric ward, or send them for referral to a psychiatrist, or send them to a hospital, or place them on NO KOP, or recommend extra monitoring, or two-person jail cell, even when they are having severe and acute psychotic meltdowns. There is insufficient policy and procedure in place to prevent what happened to Kenyada. The custom of throwing acutely psychotic inmates into one-person general population cells with a months' supply of pills is a custom that violates the civil rights of inmates, by making a policy and practice out of ignoring the psychiatric needs of mentally ill inmates.

MHM and Corizon are also liable for corporate negligence for the reasons stated above.

VI.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Because the acts and omissions of defendants go beyond all bounds of decency, and they led to Kenyada being in such a mental states as to swallow a month's supply of pills, the tort of Intentional Infliction of Emotional Distress applies. The standard for pleading an Intentional Infliction of Emotional Distress claim stipulation set forth in the Pennsylvania Suggested Standard Jury Instructions.

**Pa SSJI (Civ) 17.40. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS:**
A person who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for any bodily harm to the other that results from the emotional distress. Extreme and outrageous conduct is that which goes beyond all possible bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community. Emotional distress includes all highly unpleasant mental reactions such as [specify, for example: fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry]. Severe means that it is such that no reasonable person could be expected to endure it. In determining whether the emotional distress suffered by the plaintiff was

24

> severe, you may consider both the intensity of the distress and its duration. If you find that the defendant conducted [himself] [herself] in an extreme and outrageous manner and that conduct intentionally or recklessly caused severe emotional distress to the plaintiff, you may compensate the plaintiff for this injury."

The facts showing deliberate indifference are also sufficient for an Intentional Infliction of Emotional Distress claim. Defendants' deliberate indifference to an inmate's serious medical needs gives rise to an Intentional Infliction of Emotional Distress cause of action. See *Miller v. Hoffman*, 1999 U.S. Dist. LEXIS 9275 (EDPA.1999) ("a reasonable juror could conclude that Hoffman violated Miller's civil rights and subjected him to cruel and unusual punishment by deliberately preventing him from receiving the necessary medical care…. Accordingly, the Court finds that Miller has produced sufficient evidence of outrageous conduct to support a jury verdict for intentional infliction of emotional distress"). See also *Rodriguez v. Smith*, 2005 U.S. Dist. LEXIS 12237, 2005 WL 1484591 (EDPA.2005) ("The Amended Complaint alleges that, over the course of several years, the Medical Defendants deliberately refused to provide Plaintiff with necessary medical treatment for a brain tumor, and that the Medical Defendants verbally abused him when he sought treatment. Such conduct, if proven, is sufficiently extreme and outrageous to support an intentional infliction of emotional distress claim").

VII.   <u>PUNITIVE DAMAGES ARE WARRANTED</u>

The facts supporting a deliberate indifference claim and an infliction of emotional distress claim also support a punitive damages award. Browne and Palmer acted with deliberate intent in sending Kenyada to prison for having a mental illness. The MHM and Corizon defendants engaged in outrageous neglect in setting up all the tools by which Kenyada Jones could overdose and die.

VIII.   <u>LOSS OF EARNINGS</u>

Plaintiff provided testimony for loss of earnings, including history of work, receipt of SSI, assistance with household expenses, etc.

IX.    SECTION 504 CLAIM

Plaintiff sufficiently sets forth a §504 claim. There was an intentional violation of

Kenyada's rights under Section 504 of the Rehabilitation Act of 1973. As a mental disabled

individual, he was entitled to the same access to prison services as the nondisabled inmates. He was

entitled to be placed in the psychiatric section of the prison where he would receive care appropriate

for his situation. He was entitled to be evaluated by a psych doctor and to receive antipsychotic

medications. Defendants deprived him of these integrated services.

"As with Section 504 of the Rehabilitation Act, integrated services are essential to

accomplishing the purposes of title II of the ADA. As stated by Judge Mansmann in Adapt v.

Skinner, the goal is to eradicate the invisibility of the handicapped, separate-but-equal services

do not accomplish this central goal and should be rejected. The fact that it is more convenient,

either administratively or fiscally, to provide services in a segregated manner, does not constitute

a valid justification for separate or different services under Section 504 of the Rehabilitation Act,

or under title II of the ADA." *Helen L. v. DiDario*, 46 F.3d 325 (3rd Cir.1995).

"Subject to the provisions of this subchapter, no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity." 42 U.S.C. § 12132.

> "The ADA was enacted by Congress in 1990 'to provide a clear and
> comprehensive national mandate for the elimination of discrimination against
> individuals with disabilities.' 42 U.S.C. § 12101(b)(1). Congress found that
> 'individuals with disabilities continually encounter various forms of
> discrimination, including outright intentional exclusion, the discriminatory effects
> of architectural, transportation, and communication barriers, overprotective rules
> and policies, [and] failure to make modifications to existing facilities and
> practices . . . .' 42 U.S.C. § 12101(a)(5).… [N]o qualified individual with a
> disability shall by reason of such disability be excluded from participation in or be
> denied the benefits of the services, programs or activities of a public entity, or be

26

subjected to discrimination by any such entity.' 42 U.S.C. § 12132. Section 12131(2) defines 'qualified individual with a disability' as 'an individual with a disability who, with or without reasonable modifications to rules, policies or practices, removal of architectural barriers, or the provision of auxiliary aides and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.' *Crowder v. Kitagawa,* 81 F.3d 1480 (9th Cir. 1996).

"Liability under the ADA and § 504 can be established without a showing of discriminatory intent." Huezo v. L.A. Cmty. College Dist., 672 F. Supp. 2d 1045 (C.D. Cal. 2008).

"To prevail on a claim for a violation of Title II of the ADA, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) he was either excluded from or otherwise denied the benefits of some public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits or discrimination was by reason of the plaintiff's disability. In addition, the majority of circuit courts that have addressed the issue have held that compensatory damages under Title II of the ADA are not available absent a showing of intentional discrimination." *Kramer v. Port Auth.*, 876 A.2d 487, 2005 Pa. Commw. LEXIS 302, 16 Am. Disabilities Cas. (BNA) 1748, 2 Accom. Disabilities Dec. (CCH) 12-031 (Pa.Commw.Ct., 2005) (emphasis added).

Kenyada was denied services and programs of the prison due to his mental handicap. Defendants, who receive federal funding [City directly, MHM and Corizon indirectly through their contract with the City] are therefore liable under §504.

"To state a claim for disability discrimination under Title II of the ADA, Hollihan must allege that he: (1) has a disability; (2) was otherwise qualified to participate in a Department program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of his disability. The same standards govern claims pursuant to Section

504 of the Rehabilitation Act. In the complaint, Hollihan asserts that the Commonwealth defendants discriminated against him by categorically denying his requests for surgery under the Department's cataract policy. Hollihan further avers that the Department's denial caused him to be excluded from various programs and services at SCI Somerset because of his disability. The court agrees with Hollihan and the Commonwealth defendants that the *allegata* in Counts I and II are sufficient to state a claim under the ADA and Section 504. The Commonwealth defendants' remaining protestation misses the mark. Neither Hollihan's averments regarding the Department's cataract policy nor those concerning his access to prison programs make out independent discrimination claims; rather, these factual assertions concomitantly support Hollihan's singular claim of disability discrimination under the ADA and Section 504." *Hollihan v. Pa. Dep't of Corr.*, 159 F. Supp. 3d 502 (M.D.Pa.2016) (citing Chambers *ex rel.* Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009)).

"To the extent the defendants complain that [plaintiff] has not pled facts suggesting that the Jail declined to place him in a suicide-proof cell *because of* his generalized anxiety disorder or that any Jail policy had a disparate impact on disabled people, he need not make any such allegations because he is relying on a reasonable accommodation theory, an independent method of pleading a disparate treatment claim. Discrimination under the ADA may be established by showing "that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable [accommodation], or (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Indiana High Sch. Athletic Ass'n*, 181 F.3d 840, 847 (7th Cir. 1999). In essence, the second theory — failure to accommodate — is that by failing to accommodate an individual's disability so that individual can participate in services, programs or activities, a defendant *is* denying a service, program or activity based on disability.

*See Jaros*, 684 F.3d at 672 ("Refusing to make reasonable accommodations is tantamount to denying access."). The plaintiff has adequately pled that [the jail] deprived [plaintiff] of a safe cell, presumably with the consequence that he was unable to participate in some future service, program or activity offered by the Jail because he died. The defendants have not convinced the Court in their current briefing that such a claim is insufficient as a matter of law." *White v. Watson*, 2016 U.S. Dist. LEXIS 149111, 2016 WL 6277601.

X.    WRONGFUL DEATH & SURVIVOR ACT CLAIMS

Plaintiff states the underlying causes of action to make out Wrongful Death Act and Survivor Act claims. There is no dispute that Kenyada Jones suffered greatly leading up to his death and that he died. Wrongful Death Act claims are permitted against Commonwealth defendants despite the Sovereign Immunity Act. "The Court en banc in *Huda v. Kirk*, 122 Pa. Commw. 129, 551 A.2d 637 (Pa. Cmwlth. 1988), *appeal denied*, 524 Pa. 613, 569 A.2d 1371 (1989), *and appeal denied*, *Petition of Com., DOT*, 524 Pa. 612, 569 A.2d 1370 (1989), overruled a panel's earlier decision and concluded that a limited action under the Wrongful Death Act could be maintained against the Commonwealth." *Quinn v. Commonwealth*, 719 A.2d 1105 (Pa.Commw.1998), petition for allowance of appeal denied 558 Pa. 635, 737 A.2d 1227 (1999).

XI.    FOURTEENTH AMENDMENT APPLIES

Defendant argues that only the Eighth Amendment applies. It is not undisputed that Kenyada Jones was in prison for parole violation. He was awaiting disposition of his DUI charge, which led to detainer, which defendants revoked. For purposes of summary judgment, Kenyada was a pretrial detainee entitled to Fourteenth Amendment protections.

XII.  BROWNE/PALMER VIOLATED EQUAL PROTECTION CLAUSE

The facts of this case prove that Browne and Palmer made the decision to have Kenyada arrested and incarcerated due to his being mentally disabled, due to his being schizophrenic. They did not imprison him on 6/28/16 for violating parole conditions or for a new criminal charge. They imprisoned him, according to them, so he could receive psychiatric treatment. In other words, had he not had a mental disability, he would have been let go from the parole office and his mother and he could have decided how to treat his emotional difficulties. This gives rise to a §1983 claim.

XIII.  BROWNE & PALMER LIABLE UNDER §1983 FOR STATE CREATED DANGER

"To establish a prima facie case under section 1983, Appellants must show (1) that a person acting under color of state law (2) deprived them of a right, privilege or immunity secured by the Constitution or federal law. 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), *overruled on other grounds by, Daniels v. Williams*, 474 U.S. 327, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986); *Carter v. City of Philadelphia*, 989 F.2d 117, 119 (3d Cir. 1993).

It is undisputed that defendants were state actors for purposes of section 1983. Kenyada had a constitutionally protected, substantive due process right to bodily integrity, to not be falsely arrested, to not have his serious medical needs be ignored while he was trapped in prison. See *Albright v. Oliver*, 510 U.S. 266, 272, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994)(citation omitted); *Ingraham v. Wright*, 430 U.S. 651, 673-74, 51 L. Ed. 2d 711, 97 S. Ct. 1401 (1977).

Browne and Palmer had an affirmative duty to protect Kenyada because they created or increased the danger to which he was exposed by being stuck in prison when he needed emergency psychiatric care. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195-96, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989).

Under section 1983, a state actor may be held liable for subsequent harm to a citizen pursuant to a state created danger theory of liability if: 1) the harm ultimately caused was foreseeable and fairly direct; 2) the state actor acted in willful disregard for the safety of the citizen; 3) there existed some relationship between the state and the citizen; and 4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's act to occur. *Morse*, 132 F.3d at 908(quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996)(citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir.), *cert. denied*, 516 U.S. 858, 133 L. Ed. 2d 107, 116 S. Ct. 165 (1995)); *Marcolongo v. School Dist. of Philadelphia*, 1999 U.S. Dist. LEXIS 17407, 1999 WL 1011899 (E.D. Pa. Nov. 5, 1999).

This case meets all four prongs of the State-Created Danger test. The lack of psychiatric care inside a prison, as opposed to a psychiatric hospital, was foreseeable. Browne and Palmer acted in willful disregard for Kenyada's safety by throwing him in jail when he really needed to see a psychiatrist. Browne and Palmer had the requisite relationship with Kenyada in that they were parole officers having control over his freedom. And fourthly, they used their authority to create the opportunity for the lack of psychiatric care by taking him away from his mother coming to take him to the hospital, and sending him to prison where he was prevented from getting needed psychiatric care and deprived of his psychiatric medications.

"The state actors had actual awareness based on concrete information that was sufficient to amount to notice that the individual Appellees' omissions and commissions would enhance the risk of harm…. In addressing the second prong of the state-created danger analysis, a court must decide whether the individual Appellees acted in willful disregard for the safety of the Appellant…. Under this standard, the danger must have been foreseeable to the state actors and the state's actions must evince a willingness to ignore that foreseeable risk of danger…. Under

the state-created danger basis for alleging a constitutional violation, the relationship requirement contemplates some contact such that the Appellant was a foreseeable victim of the Appellee's acts in a tort sense…. In addressing the fourth and final prong of the state-created danger analysis, a court must decide whether the individual Appellees used their authority to create an opportunity that otherwise would not have existed for the third parties' crime to occur… Therefore, [Appellant] has alleged the deprivation of an actual constitutional right, the substantive due process right to bodily integrity under the Fourteenth Amendment." _Gremo v. Karlin,_ 363 F. Supp. 2d 771 (E.D.Pa.2005).

XIV.   <u>BROWNE & PALMER LIABLE UNDER STATE LAW</u>

It is disputed that Browne and Palmer were employed by the Commonwealth of Pennsylvania as opposed to the City of Philadelphia. Judicial notice can be taken that the City Attorney is their attorney of record for these defendants.

Browne and Palmer, by falsely arresting and imprisoning Kenyada, committed willful misconduct, which is one of the exceptions to state claim immunity.

> **§ 8550. Willful misconduct.** In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply." 42 PaCS §8550.

42 Pa. C.S. § 8501 defines Commonwealth party as "a Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment." Sending Kenyada Jones to prison to get psychiatric care was not within the scope of being a parole officer. Parole officers do not provide therapy or determine what is the best psychiatric care for a parolee. They are not psychiatrists or behavioral health providers. If they send a parolee to prison

it must be for a legal violation of the terms and conditions of parole and not, as was done here, a means of performing amateur psychoanalysis. They do not get to play doctor simply because a parolee suffers from a mental disability.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Honorable Court enter an Order denying all four of defendants' summary judgment motions in their entirety with prejudice.

Respectfully submitted,

CRISTAL LAW FIRM LLC
By:   /s/ Stephen Cristal
        Stephen Cristal, Esq. (PA Atty. ID #95020)
        100 Springdale Road, Suite A3-223, Cherry Hill NJ 08003
        Phone: (215) 917-0602, Fax: 215-914-6353, Email: cristallawfirm@aol.com
        Attorneys for Plaintiff
Dated: September 15, 2019

Appendix A
TABLE AND CERTIFICATION OF EXHIBITS

1.    Criminal Justice Expert Report and CV of Victor Lofgreen, PhD
2.    Psychiatric Expert Report and CV of Gregory Brown, MD
3.    Prison Doctor Expert Report, Supplemental Report and CV of Bonnie Nowakowski, DO
4.    US Courts' Probation Conditions Overview Manual
5.    Investigative Report on Philadelphia Prison System dated 12/4/15
6.    Investigative Report on Philadelphia Prison System dated 9/9/16
7.    Newspaper Article on Pope's Visit to Philadelphia Prison System
8.    CFCF Medical Chart - Progress Notes 02/03/2016
9.    CFCF Medical Chart - Progress Notes 02/04/2016
10.   CFCF Medical Chart – Medication Flowchart 02/03/2016
11.   CFCF Medical Chart - Progress Notes 02/29/2016
12.   CFCF Medical Chart - Progress Notes 03/02/2016
13.   CFCF Medical Chart – Medication Flowchart 03/03/2016 ["NO KOP"]
14.   CFCF Medical Chart - Progress Notes 04/21/2016
15.   CFCF Medical Chart - Progress Notes 04/22/2016
16.   CFCF Medical Chart - Progress Notes 05/06/2016
17.   CFCF Medical Chart – Telephone Encounter 05/26/2016
18.   CFCF Medical Chart - Progress Notes 06/01/2016
19.   CFCF Medical Chart - Progress Notes 06/07/2016
20.   CFCF Medical Chart - Progress Notes 06/12/2016
21.   Friends Hospital - Discharge Summary and Intake Records
22.   Philadelphia Adult Parole Office - Client File Notes
23.   Philadelphia Prison System – Intake Screening 06/28/2016
24.   Philadelphia Prison System – Mental Health Questionnaire 06/28/2016
25.   CFCF Medical Chart - Progress Notes 06/28/2016
26.   CFCF Medical Chart - Progress Notes 06/29/2016 [Gandy]
27.   CFCF Medical Chart - Progress Notes 06/29/2016 [Baldwin]
28.   CFCF Medical Chart – Medication Flowchart 07/01/2016 [lethal dose given]
29.   Philadelphia Prison System - Incident Report Excerpts
30.   Autopsy and Toxicology Reports
31.   Certificate of Death
32.   Philadelphia Prison System – Policy on Inmate KOP Program
33.   Deposition of Warden Gerald May
34.   Deposition of Jermaine Burke
35.   Deposition of Gregory Ballard
36.   Deposition of Plaintiff Michelle McDonald-Witherspoon
37.   Newspaper Article by Dana DiFilippo

38.     Deposition of Deborah Harris-White
39.     Deposition of Cheryl Baldwin
40.     Deposition of Vivian Gandy
41.     Deposition of Amber Browne

Certification

The undersigned counsel certifies that the aforementioned exhibits, attached to this brief, are true and accurate duplicates of the original documents, that they are what they purport to be and that they were duly exchanged in discovery in this case. The above statements are true and correct to the best of my knowledge, information and belief. I understand that statements herein are made subject to the penalties of 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsifications to authorities.

Dated: September 12, 2019             /s/ Stephen Cristal, Esq._____
                                     Stephen Cristal, Esquire
                                     Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE McDONALD-WITHERSPOON, | : | |
| Individually and as Administratrix of the | : | CIVIL ACTION |
| ESTATE OF KENYADA JONES | : | |
| Plaintiff | : | NO.  17-CV-1914-TON |
| vs. | : | |
| CITY OF PHILADELPHIA; ET AL. | : | |
| Defendants | : | |

**PLAINTIFF'S RESPONSE TO DEFENSE**
**JOINT STIPULATED STATEMENT OF MATERIAL FACTS**

Plaintiff responds to the Joint Statement of Material Facts on all defendants' summary judgment motions as follows.[2]

1.-4.    Admitted.

5.    MHM receives federal funding indirectly by contracting with City, which does receive federal funding.

6.    Corizon receives federal funding indirectly by contracting with City, which does receive federal funding.

7.    Denied. Browne and Palmer were employees of the City, which can be gleaned from the fact that they are being represented in this lawsuit by the City's attorney.

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Denied. He stated an idea to drive to NY, but did not actually do it.

12.    Admitted.

13.    Neither admitted nor denied. The cited material does not prove the allegation asserted.

14.    Denied. This is self-serving testimony. This is opinion testimony, not factual.

15.    Neither admitted nor denied. The testimony is self-contradictory – the car was inoperable and they were afraid he would operate it?

16.    Admitted.

17.-18.  Exact times neither admitted nor denied. Admitted only that plaintiff was in the process of traveling to the office to pick up her son.

19.    Denied. Kenyada was never aggressive. (Exhibit 36).

20.    Admitted only that Browne testified to that.

21.    Neither admitted nor denied. This is an immaterial point.

22.    Denied. They should have EMS or police come to the scene to 302. They could have walked him over to the hospital one block away. (Exhibits 1, 4).

23.    Denied. This is irrelevant opinion of Palmer.

---

[2] Admissions herein are for the limited purposes of these summary judgment motions, to avoid unnecessary expenditure of time in adjudicating the specific issues raised in these motions, and are not admissions for purposes of trial or the case in general.

24.-26. Admitted.

27.     Admitted only that Palmer with Browne made the decision to arrest and imprison Kenyada. Denied to the reasons.

28.     Denied. She wanted him out of her hair.

29.     Denied. This is self-serving opinion testimony.

30.     Admitted that Judge granted Browne/Palmer's application based on their misleading statements.

31.     Neither admitted nor denied. This is immaterial.

32.-37.  Admitted.

38.     Denied. (Exhibit 2).

39.     Denied. (Exhibit 2).

40.     Admitted only he was given an urgent psych referral.

41.     Admitted that she saw him once during the 6/28/16 – 7/2/16 incarceration.

42.     Admitted.

43.     Admitted.

44.     Admitted.

45.     Admitted that Gandy stated that, and that the KOP policy at CFCF was insufficient.

46.     Admitted that Gandy stated that.

47.-48.  Admitted.

49.     Admitted it was ordered at one point, but not given to Kenyada as of 7/2/16.

50.     Denied. (Exhibit 2).

51.-52.  Admitted.

53.-56.  Admitted only that Baldwin stated something like that in her note.

57.     Admitted.

58.-61.  Admitted only that Baldwin stated something like that.

62.     Denied. (Defendants' Exhibit T).

63.-64.  Admitted.

65.-66.  Denied. See surrounding notes and reports.

67.     Denied as stated. (Exhibit 2).

68.-69.  Admitted only that White did not do anything for Kenyada. She should have done something. (Exhibit 2).

70.     Admitted that she testified about this.

71.-74.  Admitted.

75.     Neither admitted nor denied. See Dr. Brown's opinions. (Exhibit 2).

76.     Admitted.

77.     Admitted only that they were not aware. The prior suicidal thoughts and attempts are in his medical records. (Exhibits 8, 9, 21).

78.     Denied. (Exhibits 2, 8, 9, 21).

79.     Admitted.

80.-81.  Denied. He is the warden. He has the role and responsibility and oversight for the policies and procedures and staff training for the jail. Whether he physically drafts the manuals is immaterial.

82.-91.  Admitted only that a written "policy" existed. Denied that the policy was sufficient or regularly followed.

92.-96.  Admitted.

97.     Admitted that a training course exists on paper.

98.     Denied. There is no factual basis for that statement.

99.-102.  Denied. (Exhibits 1-7, 32, 37).

103.     Admitted.

104.-106.  Denied. (Exhibits 1-7, 32, 37).

107.     Admitted.

108.-109.  Denied. (Exhibit 36, 87-90; Defendant's Exhibit GG).


        CRISTAL LAW FIRM LLC

By:   /s/ Stephen Cristal

        Stephen Cristal, Esq. (PA Atty. ID #95020)

        100 Springdale Road, Suite A3-223, Cherry Hill NJ 08003

        Phone: (215) 917-0602, Fax: 215-914-6353, Email: cristallawfirm@aol.com

        Attorneys for Plaintiff

Dated: September 15, 2019

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE McDONALD-WITHERSPOON, | : | |
| Individually and as Administratrix of the | : | CIVIL ACTION |
| ESTATE OF KENYADA JONES | : | |
| Plaintiff | : | NO.  17-CV-1914-TON |
| vs. | : | |
| CITY OF PHILADELPHIA; ET AL. | : | **PROOF OF SERVICE** |
| Defendants | : | |

The undersigned certifies that on this date true and correct copies of the above pleadings, including all attachments, were duly served on all parties in this case via electronic transmission through the Court's Efiling notification system, or via email, or via first-class US mail postage prepaid, to the following addressee(s):

Shannon Zabel, Esquire, Assistant City Solicitor, City of Philadelphia Law Department
1515 Arch Street, 14th Floor, Philadelphia, PA 19102
P: 215-683-5381/215-683-5114, E: shannon.zabel@Phila.gov
Attorney for City of Philadelphia, Warden Gerald May, Amber Browne and Jeanette Palmer

Cassidy L. Neal, Esquire of Matis Baum O'Connor
912 Fort Dusquesne Blvd., Pittsburgh PA 15222
Phone: 412-338-4750, Email: cneal@mbo-pc.com
Attorney for MHM Services, Inc., Deborah Harris-White, LSW and Cheryl Baldwin, MSW

Lisa A. Cauley, Esquire of O'Connor Kimball LLP
Two Penn Center Plaza, Suite 100, 1500 JFK Boulevard, Philadelphia PA 19102
P: 215-564-0400, E:; lcauley@okllp.com
Attorney for Defendant Corizon Health Inc., Vivian Gandy, MD

CRISTAL LAW FIRM LLC
By:    /s/ Stephen Cristal
       Stephen Cristal, Esq. (PA Atty. ID #95020)
       100 Springdale Road, Suite A3-223, Cherry Hill NJ 08003
       Phone: (215) 917-0602, Fax: 215-914-6353, Email: cristallawfirm@aol.com
       Attorneys for Plaintiff
Dated: Sept. 17, 2019