IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE MCDONALD-WITHERSPOON, | : | CIVIL ACTION |
| individually and as Administratrix of the Estate | : | |
| of Kenyada Jones | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | NO.  17-1914 |

## MEMORANDUM

**Padova, J.**                                                                                              **August 25, 2020**

        This is a civil rights action arising out of the death of Plaintiff Michelle McDonald-Witherspoon's son, Kenyada Jones, who died while in custody at the Curran-Fromhold Correctional Facility ("CFCF").  Plaintiff brings claims on behalf of herself and the estate of her son for civil rights violations pursuant to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); 42 U.S.C. § 1983 ("Section 1983"); and state law.  Plaintiff asserts these claims against a private healthcare provider for CFCF, Corizon Health, Inc. ("Corizon"), and a Corizon employee, Vivian Gandy, M.D. (collectively, the "Corizon Defendants"); a second private healthcare provider for CFCF, MHM Services, Inc. ("MHM"), and two MHM employees, Cheryl Baldwin and Deborah Harris-White (collectively, the "MHM Defendants"); two probation officers from the Philadelphia Adult Parole and Probation Department ("APPD"), Amber Browne and Jeanette Palmer; and the City of Philadelphia (the "City").  The Corizon Defendants, the MHM Defendants, Browne and Palmer, and the City have filed Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, we grant the Motions in part and deny them in part.

## I.       BACKGROUND

The following facts are in the summary judgment record.  Kenyada Jones was a 45-year-old African American male with a history of mental illness, including past diagnoses of schizophrenia and depression, self-reported prior suicide attempts in 1993 and 1996, and multiple psychiatric hospitalizations.  (Pl.'s Ex. 8 at 30 of 31; Pl.'s Ex. 21 at 1.)  On February 2, 2016, Jones was arrested for DUI.  (Browne Dep. (Pl.'s Ex. 41 & Joint Defense Appendix ("JDA") Ex. F) at 183:24-184:2.)  This arrest violated the terms of Jones's probation, which was imposed for a prior aggravated assault conviction.  (Browne Dep. at 184:3-9; JDA Ex. J.)  As a result of the arrest, Jones was in custody at CFCF until June 13, 2016.  During this time, Corizon and MHM employees evaluated and treated Jones's physical and mental health condition.  (See Pl.'s Exs. 8-20.)  They recorded Jones's history of suicidal thoughts and behaviors and also noted Jones's various mental and physical ailments, including anxiety, depression, paranoia, and high blood pressure.  (See, e.g., Pl.'s Exs. 8-9, 12, 14, 16, 18-20.)  Corizon prescribed Jones blood pressure medication (Amlodipine), and MHM prescribed him psychotropic medication (Zyprexa, a brand name for Olanzapine).  (See Pl.'s Ex. 9 at 1; Pl.'s Ex. 10; Pl.'s Ex. 12; Pl.'s Ex. 16; Pl.'s Ex. 18; Pl.'s Ex. 19.)

According to the Philadelphia Prisons Policies and Procedures,[1] all medications prescribed at CFCF were to be either "dispensed by Nursing Staff in multiple dose quantities, and . . . then possessed by inmates and self-administered" (referred to as "KOP," which is short for "Keep On Person") or "administered by Nursing Staff dose by dose" (referred to as "DOT," which is short for "Directly Observed Therapy").  (JDA Ex. AA at 1-2.)  "Psychotropic medications" are

_____

[1] According to Gerald May, the warden of CFCF at all relevant times, CFCF follows the Philadelphia Prisons Policies and Procedures, which are promulgated by the Philadelphia Department of Prisons.  (May Dep. (Pl.'s Ex. 33 & JDA Ex. X) at 38:6-11.)

designated as DOT medications. (Id. at 3.) Jones's blood pressure medication (Amlodipine) is not designated as a DOT medication, but the prison health care staff may nonetheless require it to be administered as DOT for "[i]ndividual inmates who have a propensity to abuse or misuse medication." (Id.) When DOT administration is required for an individual inmate, the treating physician is to document the reasons in the inmate's health care record. (Id.) CFCF records show that Jones's medications, including Zyprexa and Amlodipine, were at times administered on a DOT basis prior to his release on June 13, 2016. (See Pl.'s Ex. 11 at 8 of 28; Pl.'s Ex. 13; Pl.'s Ex. 14 at 15 of 28; Pl.'s Ex. 16 at 24 of 28; Pl.'s Ex. 17 at 27 of 28; Pl.'s Ex. 18 at 3 of 44; Pl.'s Ex. 19 at 8 of 44.)

On June 16, 2016, only days after his release from CFCF, Jones voluntarily committed himself into Friends Hospital with complaints of increased paranoia and depression and was found, on examination, to have "[s]uicidal ideations . . . with [a] plan to overdose on pills." (Pl.'s Ex. 21 at 1.) Jones stayed at Friends Hospital for approximately one week for mental health treatment and received Zyprexa to alleviate his reported symptoms. (Id. at 2.) His medication was later changed to Haldol, at his request. (Id.) After Jones indicated that he would like to leave the hospital, he was observed for a 72-hour period prior to discharge. (Id.) During that period, Jones "[d]enied suicidal or homicidal ideations" and "all psychiatric and physical symptoms." (Id.) Friends personnel determined that he had "reached . . . his baseline and received maximum inpatient treatment benefit" and that he was "[s]table for discharge," and released him on June 22, 2016. (Id.)

Following his release, Jones went to live with Plaintiff, where according to Plaintiff, Jones's mental health condition "got worse." (Plaintiff Dep. (Pl.'s Ex. 36 & JDA Ex. G) at 111:16-112:2, 125:10-14.) Specifically, Plaintiff observed that, even though Jones was taking the

medication prescribed for him at Friends Hospital, he was "short tempered," "couldn't sleep," was "very hyper," and suffered from worsening paranoia.  (Id. at 112:14-113:14, 125:15-23.)  Plaintiff spoke with her other son and daughter about Jones's worsening condition and discussed a plan to have Jones involuntarily committed at a psychiatric hospital, i.e., 302'd.  (Id. at 178:17-179:7.)  To facilitate this plan, Plaintiff's children "had the idea to disable [Jones's] car" so that Jones could not leave Plaintiff's home.  (Id. at 178:17-179:20.)  Nevertheless, Jones was able to drive away in his car.  (Id. at 179:18-180:2.)

Because Plaintiff could not get Jones to stay home so that she could have him involuntarily committed to a psychiatric hospital, Plaintiff called Jones's probation officer, Amber Browne, for help.  (Id. at 96:15-23; 127:10-16; 180:3-7.)  Plaintiff chose to call Browne because she believed that Jones was "crazy about [her]" and "felt like [Browne] cared about him."  (Id. at 96:24-97:2; 183:6-15.)  During the call, Plaintiff expressed her "concern[s] about [Jones's] behavior" and her belief that she didn't think Jones's psychotropic medication was working.  (Browne Dep. at 91:15-21.)  Plaintiff explained that she couldn't "get [Jones] to stay in the house" and asked Browne to "call him to come and see [Browne] so that [Plaintiff could] . . . come and take him and have him 302'd."  (Plaintiff Dep. at 127:10-16.)  Browne agreed to help Plaintiff and hold Jones at the probation office for this purpose.  (Id. at 127:17-23.)

On the morning of June 28, 2016, Jones arrived at the probation office.  (Palmer Dep. (JDA Ex. E) at 29:7-13.)  According to Browne, Jones had parked illegally, so Browne and Jeannette Palmer, Browne's supervisor at APPD, had Jones move his car.  (Browne Dep. at 146:10-24.)  As Jones moved his car, Browne and Palmer noticed that he was driving erratically and that there might be a problem with his car.  (Palmer Dep. at 49:5-23.)  In fact, Browne saw Jones "almost hit someone trying to cross the street" and noticed that his "car [was] smoking."  (Browne Dep. at

148:3-5.)  Similarly, another APPD officer who observed Jones move his car, "witnessed . . . Jones [driving] very erratically, driving from one side to the other trying to park the vehicle almost hitting people out of control," saw Jones "almost hit . . . Palmer" while backing up, and noticed smoke coming out from under the hood of Jones's car.  (Carassai Dep. (JDA Ex. I) at 10:1-6, 19:11-20.)

Once Jones was inside the probation office, Browne called Plaintiff to notify her that Jones had arrived.  (Plaintiff Dep. at 128:5-16.)  While Browne and Palmer waited for Plaintiff, they observed that Jones appeared to be decompensating as he was getting increasingly agitated and aggressive, was sweating profusely and rambling, and appeared to be responding to internal stimuli.  (Browne Dep. at 171:10-173:18; Palmer Dep. at 42:17-43:17.)  According to Browne, Jones "wasn't stable," "he [was] display[ing] manic behavior," "his meds clearly were not working," and he was "not being coherent [or] making sense."  (Browne Dep. at 132:8-10, 198:10-18.)  Palmer also observed that "[Jones] was pushing the table.  He was pushing back in the chair. He jumped up.  He sat down.  He moved over.  He banged the wall.  He was back and forth." (Palmer Dep. at 43:5-9.)  Moreover, Jones appeared "frustrated" because "[h]e wanted to go to New York to save his brother from ISIS."  (Id. at 43:17-21.)

Palmer also discovered while Jones was at the probation office that "[Jones] was in technical violation" of his probation because he had an open bill for incurring a new arrest for DUI.  (Palmer Dep. at 48:16-23; Browne Dep. at 182:4-20.)  Due to Jones's high risk of danger to himself and others, as well as the open bill, Palmer detained him and instructed Browne to fill out a warrant request form to take Jones into custody.  (Palmer Dep. at 33:22-24, 49:3-24; Browne Dep. at 170:17-22, 208:16-209:10; Pl.'s Ex. 22 at 5.)  Browne filled out the form, which Palmer signed, and then submitted the form for approval to the Philadelphia County Court of Common Pleas.  (Browne Dep. at 156:8-157:13; see also JDA Ex. J.)  That same day, Judge Jeffrey P.

Minehart issued a bench warrant for Jones for a violation of probation.  (JDA Ex. J.)  Jones was thus arrested and taken into custody.  (Pl.'s Ex. 22 at 5.)

Plaintiff later arrived at the probation office, where Browne and Palmer notified her of Jones's arrest and "explained to [her] why it was necessary to detain [him]."  (Pl.'s Ex. 22 at 5.) Browne also emailed and attempted to call an MHM employee "to inform them that [Jones] was on his way [to CFCF] and to provide a list of meds" to ensure that Jones would be "properly medicated while in custody."  (Id. at 4.)  Browne eventually spoke to someone at the prison by phone and confirmed that Jones was scheduled to see a doctor that night.  (Id.)  As a result, Browne believed that Jones would receive medication at the prison.  (Browne Dep. at 250:21-251:10.)

At CFCF, intake personnel administered a mental health questionnaire to determine whether Jones had potential mental health problems requiring further attention.  (See Pl.'s Ex. 24.) The individual who administered the mental health questionnaire concluded that Jones required an Urgent Referral to mental health services based on observations that Jones was "anxious"; was "agitated or [exhibited] extreme anger"; exhibited an "extreme change (in mood)"; was "afraid of others with no apparent reason"; was "confused or disoriented"; "display[ed] . . . bizarre behavior"; "repeat[ed] the same idea over and over"; "talk[ed] without any meaning" and "to self when no one is present"; was "hyper"; and exhibited "rushed speech patterns."[2]  (Pl.'s Ex. 24.)

Later that night, Corizon employees conducted a physical examination of Jones.  (Gandy Dep. (Pl.'s Ex. 40 & JDA Ex. L) at 20-25; see also Pl.'s Ex. 25.)  Jones was first seen by a medical assistant, who checked his blood pressure, pulse and respiration, took blood and urine samples,

---

[2] According to Philadelphia Prisons Policies and Procedures, "Urgent Referrals are made . . . when there is no immediate risk of harm to self or others, despite emotional distress or mental disorder that compromises the inmate's ability to manage daily life."  (JDA Ex. Y at 6.)  "Urgent Referral inmates are seen . . . within twenty-four (24) hours."  (Id.)

and performed a tuberculosis test.  (Gandy Dep. at 24.)  Nurse Mariamma Samuel then went through the medical questionnaire with Jones and, after he signed the questionnaire, performed a physical examination.  (Id.; Pl.'s Ex. 25.)  Samuel asked Jones questions about his mental health in connection with the questionnaire.  (Pl.'s Ex. 25 at 42-43 of 44.)  Jones informed Samuel that he was taking medication for mental health problems and that he had a history of mental health treatment.  (Id.)  He was asked if he felt hopeless or if he was thinking about killing himself, and he answered no.  (Id. at 43 of 44.)  He also denied that he had ever attempted suicide.  (Id. at 42 of 44.)  Jones further denied ever having been hospitalized for mental health problems, even though he had recently been discharged from Friends hospital.  (Id. at 42-43.)

Dr. Vivian Gandy then reviewed Jones's chart and met with Jones prior to co-signing Samuel's examination.  (Gandy Dep. at 25.)  Although Gandy did not normally see every inmate at intake, Gandy believed that she had to see Jones because he had complained to Samuel about cancer, kidney failure, and multiple boils all over his body.  (Id. at 27, 64.)  In spite of Jones's complaint of boils, Gandy did not see any boils on his body.  (Id. at 64.)  She nevertheless did not find Jones's state of mind to be "out of the ordinary" given his mental health history, and she did not think he was delusional.  (Id. at 64-65.)  Rather, Gandy thought that Jones was reporting conditions that he might have had in the past and that he might have "overexaggerated."  (Id.)  Based on Samuel's examination of Jones and her own meeting with him, Gandy concluded that an Urgent Referral to MHM would be sufficient to address Jones's mental health needs.  (Id. at 31:3-14, 71:11-16.)  Gandy also assessed Jones as having hypertension and prescribed 10 mg of the blood pressure medication, Amlodipine, for him to take once per day.  (Pl.'s Ex. 26.)  She determined that it was appropriate for Jones to keep a 30-day supply of that medication on a KOP

basis and entered an order for 10 mg of Amlodipine for 90 days, of which a 30-day supply would be given to him in blister packs to be kept on his person.  (Gandy Dep. at 44:13-45:3, 76-77.)

The next day, on June 29, 2016, Jones met with Cheryl Baldwin, an MHM social worker, for his Urgent Referral.  (See Pl.'s Ex. 27.)  Baldwin's role was to determine if Jones was in extreme danger, i.e., if he was suicidal or highly psychotic.  (Baldwin Dep. (Pl.'s Ex. 39 & JDA Ex. B) at 58.)  Baldwin performed a suicide risk evaluation, during which Jones again denied prior suicidal behavior and ideation, and reported a history of schizoaffective disorder.  (Pl.'s Ex. 27 at 5-7 of 40.)  During his evaluation, Jones confirmed that Zyprexa "usually [helped him] with his episodes of paranoi[a] and sleep."  (Id. at 5 of 40.)  Baldwin assessed Jones as appearing "oriented and manic" and motivated to continue his mental health treatment.[3]  (Id. at 7 of 40.)  Based on this information, Baldwin determined that Jones's risk of suicide was low, confirmed that he was receptive to taking Zyprexa, and referred him to a psychiatrist for a routine initial psychiatric evaluation.  (Baldwin Dep. at 54:4-9, 60:15-61:4; Pl.'s Ex. 27 at 7 of 40.)

Jones was scheduled to be transferred within CFCF to the "Detention Center" on July 2, 2016.  (Pl.'s Ex. 29 at 12 of 40.)  "[H]owever, his transfer was postponed due to . . . irrational statements [he] made before" the transfer.  (Id. at 12, 14 of 40.)  Instead, Jones was scheduled for another mental health referral with MHM.  (Id.)  After Jones complained that he had not received his psychotropic medication, he was seen on July 2, 2016 by MHM social worker, Deborah Harris-White, for an Emergency Referral.[4]  (JDA Ex. T at 1 of 3.)  Harris-White reviewed Jones's most

---

[3] Baldwin also noted that Jones "presented with sweat on his face," but Jones attributed the sweat to "playing basketball."  (Pl.'s Ex. 27 at 7 of 40.)

[4] According to Philadelphia Prisons Policies and Procedures, "[a]n Emergency Referral is made whenever staff observes behavior and/or the verbalizations of an inmate that indicate an inmate is in imminent/immediate danger of self-injury."  (JDA Ex. Y at 6 of 17.)  "Normally, Emergency Referral inmates are seen . . . within four (4) hours and will be on a Constant Watch

recent medical records and conducted a suicide risk evaluation.  (Harris-White Dep. (Pl.'s Ex. 38 & JDA Ex. U) at 64:4-6; JDA Ex. T.)  Harris-White observed that Jones was "oriented," was "very cooperative and calm," "presented with a low affect," and "appeared lucid and was able to engage in a logical and coherent conversation regarding his [mental health] treatment."  (JDA Ex. T at 2 of 3.)  Jones reported that he was "not receiving his medication and [was] concerned about the 'voices coming back,'" but nonetheless denied any prior suicidal behaviors or thoughts and any current suicidal ideation.  (Id. at 1-2.)  Based on her examination, Harris-White concluded that Jones had no acute mental health needs on that day and contacted medical to find out if he had been receiving his medications.[5]  (Id. at 2-3 of 3; Harris-White Dep. at 62:1-20.)  CFCF medical records show that a 14-day prescription for Zyprexa had been ordered for Jones on June 29, 2016.  (JDA Ex. P; Baldwin Dep. at 52:12-53:6.)  This medication was the same medication Jones was prescribed when he was previously incarcerated at CFCF.  (JDA Ex. O; Baldwin Dep. at 52:12-53:6.)

Later that same day, July 2, 2016, Jones was found dead in his cell lying next to an empty packet of medication with toxic levels of Amlodipine and trace amounts of Zyprexa in his system.[6]  (Burke Dep. (Pl.'s Ex. 34) at 27:14-29:10; Pl.'s Ex. 30 at 21, 26 of 40; JDA Ex. BB at 3.)  The Office of the Medical Examiner conducted an autopsy and determined that Jones had caused his

---

from the time of the Emergency Referral until the inmate has been released from observation . . . ."  (Id.)

[5] Earlier that day, corrections officers reported that "Jones had attempted to flood his cell" by "put[ting] water on the floor in his cell."  (Pl.'s Ex. 29 at 11 of 40; Ballard Dep. (Pl.'s Ex. 35) at 17:21-18:14.)  However, Harris-White testified that she did not remember anyone telling her about that behavior.  (Harris-White Dep. at 31:11-15.)

[6] Jones was alone in his cell at the time of his death because prison staff had moved his cellmate to another cell on June 30, 2016 due to Jones's continued complaints of bladder pain.  (Pl.'s Ex. 29 at 11 of 40.)

own death by overdosing on Amlodipine, which he had received the previous day. (Pl.'s Ex. 28; Pl.'s Ex. 30 at 17 of 40; see also Pl.'s Ex. 3 at 29 of 41.) The medical examiner concluded that "[d]ue to the natural course of the decedent's disease, it [is] likely that the decedent had some decline in cognitive functioning and would not have been fully cognizant of the ramifications of his actions[; t]herefore, the manner of death is best classified as 'Undetermined.'" (Pl.'s Ex. 30 at 22 of 40.)

Plaintiff's Second Amended Complaint asserts the following claims: (1) Count One asserts claims pursuant to Section 504 (for discrimination), Section 1983 (for violations of Jones's rights under the Eighth and Fourteenth Amendments), and state law (for medical malpractice, corporate negligence, and intentional infliction of emotional distress) against the Corizon and MHM Defendants; (2) Count Two asserts claims pursuant to Section 1983 (for violations of Jones's rights under the Fourteenth Amendment) and state law (for false arrest, false imprisonment, malicious prosecution, abuse of process, and intentional infliction of emotional distress) against Browne and Palmer; (3) Count Three asserts claims pursuant to Section 504 (for discrimination) and Section 1983 (for violations of Jones's rights under the Eighth and Fourteenth Amendments) against the City; and (4) Counts Four and Five assert Pennsylvania Wrongful Death and Survival Act claims against all Defendants. Defendants have filed four Motions for Summary Judgment: one by the Corizon Defendants, one by the MHM Defendants, one by Browne and Palmer, and one by the City. They seek judgment in their favor on all of Plaintiff's claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

factual dispute is "material" if it "might affect the outcome of the suit under the governing law."

Id.  In ruling on a summary judgment motion, we consider "the facts and draw all reasonable

inferences in the light most favorable to . . . the party who oppose[s] summary judgment." Lamont

v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378

(2007)).  If a reasonable fact finder could find in the nonmovant's favor, summary judgment may

not be granted.  Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002)

(citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular

issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district

court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325.

After the moving party has met its initial burden, the adverse party's response "must support the

assertion [that a material fact is genuinely disputed] by: (A) citing to particular parts of materials

in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not

establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  Summary judgment is

appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." Celotex, 477 U.S. at 322.  "'While the evidence that the non-moving

party presents may be either direct or circumstantial, and need not be as great as a preponderance,

the evidence must be more than a scintilla.'" <u>Galli v. N.J. Meadowlands Comm'n</u>, 490 F.3d 265, 270 (3d Cir. 2007) (quoting <u>Hugh v. Butler Cty. Family YMCA</u>, 418 F.3d 265, 267 (3d Cir. 2005)).

## III.   DISCUSSION

### A.   <u>Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701</u>

Counts One and Three assert claims against Corizon, MHM, and the City for discrimination against Jones on the basis of his mental health disability in violation of Section 504 of the Rehabilitation Act.  Section 504 of the Rehabilitation Act "'bars both federal agencies and private entities that receive federal funding from discriminating on the basis of disability and is not limited to the employment context.'" <u>Kortyna v. Lafayette Coll.</u>, 47 F. Supp. 3d 225, 238 (E.D. Pa. 2014) (quoting <u>Freed v. Consol. Rail Corp.</u>, 201 F.3d 188, 190 (3d Cir. 2000)).  Section 504 specifically provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).

To succeed on a claim under Section 504, a plaintiff must establish the following: "'(1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability.'" <u>Defreitas v. Montgomery Cty. Corr. Facility</u>, 525 F. App'x 170, 178 (3d Cir. 2013) (quoting <u>Bowers v. Nat'l Collegiate Athletic Ass'n</u>, 475 F.3d 524, 553 n.32 (3d Cir. 2007)).  Additionally, the plaintiff "must show that the allegedly discriminating entity receives federal funding." <u>CG v. Pa. Dep't of Educ.</u>, 734 F.3d 229, 235 n.10 (3d Cir. 2013) (citation omitted).  A plaintiff may establish discrimination by the entity receiving federal funding by presenting evidence that the entity failed to make reasonable

accommodations for the plaintiff's disability.  See Defreitas, 525 F. App'x at 178 (citing 28 C.F.R. § 35.130(b)(7)).  In the prison context, the plaintiff must show that he was denied a reasonable accommodation that would have given "a disabled prisoner 'meaningful access' to the prison program in question."  Id. at 178 n.14 (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985)).

### 1.  Corizon and MHM

The Corizon and MHM Defendants argue that Corizon and MHM are entitled to summary judgment in their favor on Plaintiff's Section 504 claims because the undisputed evidence establishes that neither entity receives federal funding.  As described above, the Rehabilitation Act, "'applies only to programs and activities receiving federal financial assistance.'"  Talley v. Doyle, Civ. A. No. 19-1588, 2019 WL 6050739, at *1 n.1 (E.D. Pa. Nov. 15, 2019) (quoting Yeskey v. Com. of Pa. Dep't of Corrs., 118 F.3d 168, 170 (3d Cir. 1997), aff'd sub nom., Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206 (1998)).  Corizon and MHM have submitted the sworn affidavits of their respective general counsel, who aver that Corizon and MHM do not receive federal financial assistance.  (See Johnson Aff. (JDA Ex. C) ¶¶ 2, 4; King Aff. (JDA Ex. D) ¶¶ 1, 3.) Plaintiff has adduced no evidence to the contrary.

Plaintiff argues instead that Corizon and MHM are recipients of federal funds within the meaning of Section 504 because both entities are indirect beneficiaries of federal financial assistance through their contracts with the City.  Under Section 504, however, an entity does not become a "recipient" of federal financial assistance simply by being an indirect beneficiary of federal funds.  Indeed, "a 'recipient' of federal funds [under Section 504] means any entity to which federal financial assistance is 'extended directly or through another recipient' but excludes the 'ultimate beneficiary of the assistance.'"  Davenport v. Natgun Corp., 941 F. Supp. 2d 141, 146 (D. Mass. 2013) (quoting 45 C.F.R. § 84.3(f)) (concluding that a company that builds storage

tanks for municipalities is not a recipient of federal funds even though the municipalities for which it works for receive federal funds because Section 504 "prohibits . . . discrimination by entities that Congress intended to received federal financial assistance but does not reach those 'who merely benefit from the aid.'" (quoting U.S. Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 607 (1986)); see also Paralyzed Veterans of Am., 477 U.S. at 607 (noting that, while the Government may disburse funds to its intended recipients through an intermediary, "federal coverage [does not] follow[] the aid past the [intended] recipient to those who merely benefit from the aid"). Therefore, even if Plaintiff had presented evidence that Corizon and MHM indirectly benefited from federal funds, which she has not, such evidence could not establish that Corizon and MHM were "recipients" of federal funds within the meaning of Section 504. Plaintiff has thus failed to adduce any evidence to support a conclusion that Corizon and MHM can be subject to liability under Section 504. Accordingly, we grant the Corizon and MHM Defendants' Motions for Summary Judgment insofar as they seek judgment in favor of Corizon and MHM on Plaintiff's Section 504 discrimination claim in Count One.

### 2. The City

Plaintiff's Section 504 claim against the City is based on an argument that the City failed to make reasonable accommodations for Jones's mental disability when it failed to provide Jones with his psychotropic medication, place Jones in the psychiatric ward of the prison, and have a psychiatrist evaluate him. The City argues, inter alia, that it is entitled to summary judgment in its favor on this claim because the evidence cannot support a reasonable conclusion that Jones's disability was the sole reason for the City's alleged failures. As the City contends, under Section 504, a plaintiff's disability "must be the sole cause of the [defendant's alleged] discriminatory action." Furgess v. Pa. Dep't of Corrs., 933 F.3d 285, 291 n.25 (3d Cir. 2019) (citing CG, 734

F.3d at 236 n.11); see also CG, 734 F.3d at 236 n.11 ("Because the [Rehabilitation Act's] causation requirement requires disability to be the sole cause of discrimination, an alternative cause is fatal to a[] [Rehabilitation Act] claim because disability would no longer be the sole cause." (citation omitted)); 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." (emphasis added)).  Here, Plaintiff has failed to point to any evidence that could support a reasonable inference that Jones's mental health disability was the reason for the City's alleged failure to accommodate Jones, much less that Jones's mental health disability was the sole reason for the City's alleged discrimination.[7]  On independent review, we have also failed to find any such evidence in the summary judgment record.  We therefore conclude that Plaintiff has failed to present evidence necessary to support her Section 504 claim against the City.  Accordingly, we grant the City's Motion for Summary Judgment insofar as it seeks judgement in favor of the City on Plaintiff's Section 504 discrimination claim in Count Three.[8]

---

[7] Plaintiff maintains that she does not need to submit evidence that Jones's disability was the sole reason why the City failed to accommodate him because a claim for discrimination under Section 504 relying on a reasonable accommodation theory does not require such evidence. Plaintiff relies on White v. Watson, Civ. A. No. 16-560, 2016 WL 6277601, at *6 (S.D. Ill. Oct. 27, 2016), in which the court denied a motion to dismiss an American with Disabilities Act ("ADA") claim brought on behalf of a prisoner who committed suicide in his cell. Id. at *2. However, the court in White analyzed whether the plaintiff had satisfied the causation standard for a claim brought under Title II of the ADA, 42 U.S.C. § 12132, not Section 504. Id. at *5. Significantly, the "[c]ausation standards are different under the ADA and [Section 504]—under [Section 504], the disability must be the sole cause of the discriminatory action, while the ADA only requires but-for causation." Furgess, 933 F.3d at 291 n.25 (citing CG, 734 F.3d at 236 n.11). We therefore reject Plaintiff's position that she need not submit evidence that Jones's disability was the sole reason that the City failed to accommodate him.

[8] The City also argues that it is entitled to summary judgment with respect to Plaintiff's Section 504 claim insofar as the claim is based on a theory that Jones's disability was a vulnerability to suicide and that the City failed to accommodate him by improperly denying him

B. Section 1983 Medical Care Claims

Counts One through Three assert claims against the Corizon Defendants, the MHM Defendants, and the City for deliberate indifference to Jones's serious medical needs pursuant to 42 U.S.C. § 1983.  Section 1983 provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws.  It does not, by its own terms, create substantive rights." Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (footnote omitted) (citing Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979)).  Consequently, in order to obtain relief pursuant to § 1983, "a plaintiff must demonstrate [that] the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States." Id. (citing Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999); Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

1. *Deliberate Indifference to Jones's Serious Medical Needs*

Count One of the Second Amended Complaint asserts a Section 1983 claim that Corizon and MHM employees, Gandy, Baldwin, and Harris-White, were deliberately indifferent to Jones's

---

suicide prevention services.  The City argues that it is entitled to judgment in its favor on this claim because there is no evidence in the summary judgment record that Jones actually committed suicide.  However, Plaintiff states in her opposition brief that she "does not concede that [a particular vulnerability to suicide] theory applies to the[] facts [of this case]."  (Opp. at 21.) Accordingly, we conclude that Plaintiff's Section 504 claim is not based on the theory that Jones's disability was a vulnerability to suicide, and thus, we need not address the City's argument that it would be entitled to judgment in its favor on any such claim.

16

serious medical needs.  A prisoner's right to adequate medical care stems from the Eighth Amendment, which, "through its prohibition on cruel and unusual punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'"  Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (quoting Helling v. McKinney, 509 U.S. 25, 32 (1993)).  At the same time, the Due Process Clause of the Fourteenth Amendment provides the same right to medical care for pretrial detainees as the Eighth Amendment requires for convicted prisoners.[9]  Colburn v. Upper Darby Twp., 838 F.2d 663, 668 (3d Cir. 1988).  To succeed on a claim under Section 1983 for deliberate indifference to a serious medical need, a plaintiff must show: "[1] a serious medical need, and [2] acts or omissions by prison officials that indicate deliberate indifference to that need."  Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).[10]

The Corizon and MHM Defendants argue, inter alia, that they are entitled to summary judgment in their favor on Plaintiff's Section 1983 claim for deliberate indifference to Jones's serious medical needs because Plaintiff has not pointed to any evidence that could support a reasonable conclusion that Gandy, Baldwin, or Harris-White acted with deliberate indifference. Plaintiff maintains that Gandy, Baldwin, and Harris-White were deliberately indifferent to Jones's

---

[9] The parties disagree as to whether Jones was a prisoner or a pretrial detainee during the relevant time period.  However, we need not resolve this dispute here as the same deliberate indifference standard applies under both the Eighth and Fourteenth Amendments.

[10] The MHM Defendants maintain that to the extent Plaintiff intends to assert her claim using a vulnerability to suicide theory, "her claim[] must be evaluated under the [United States Court of Appeals for the] Third Circuit's particular vulnerability to suicide framework." (MHM Br. at 12 (citing Palakovic v. Wetzel, 854 F.3d 209, 224 (3d Cir. 2017).)  However, as discussed above in note 8, Plaintiff does not concede that a particular vulnerability to suicide theory applies to the facts of this case. (Opp. at 21.)  We therefore need not address the MHM Defendants' contention that we must analyze Plaintiff's claims under a particular vulnerability to suicide framework.

serious medical needs when they failed to: (1) recognize the severity of Jones's mental illness and recommend that Jones be sent to the psychiatric ward at CFCF, (2) refer him to a psychiatrist, (3) administer his medication on a No KOP basis, and (4) closely monitor his medication.

"'[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment.'" Tate v. Wiggins, 805 F. App'x 159, 162 (3d Cir. 2020) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976). Although "[d]eliberate indifference to a prisoner's serious medical needs can give rise to . . . a constitutional violation[,] . . . mere medical malpractice will not." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). Thus, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." Palakovic v. Wetzel, 854 F.3d 209, 227 (3d Cir. 2017) (citing Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993)). Indeed, "[d]eference is given to prison medical authorities in the diagnosis and treatment of patients, and courts 'disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment.'" Id. at 228 (second and third alterations in original) (quoting Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)). Accordingly, a "prison doctor[']s professional judgment . . . will be presumed valid 'unless it is such a substantial departure from professional judgment, practice or standards as to demonstrate that the doctor did not base the decision on such a judgment.'" Soto-Muniz v. Martin, 665 F. App'x 226, 228 (3d Cir. 2016) (quoting White v. Napoleon, 897 F.2d 103, 113 (3d Cir. 1990)); see also Pearson, 850 F.3d at 539 (quoting Youngberg v. Romeo, 457 U.S. 307, 323 (1982)).

Here, the record evidence "demonstrate[s] that [Jones] did receive some amount of medical attention" from Corizon's intake physician, Dr. Vivian Gandy.  Green v. Coleman, 575 F. App'x 44, 48 (3d Cir. 2014).  As detailed above, on June 28, 2016, Nurse Mariamma Samuel conducted an intake screening of Jones, asking him questions about his health, performing a physical examination on him, and making note of his history of mental illness and prior use of psychotropic medications.  (Gandy Dep. at 22-24; Pl.'s Ex. 25.)  Thereafter, Dr. Gandy saw Jones to confirm whether "he had anything significant [she] need[ed] to treat."  (Gandy Dep. at 21:1-16, 25.)  Gandy spent about five minutes speaking with and observing Jones.  (Id. at 34-35.)  While Jones had complained to Samuel about cancer, kidney failure, and multiple boils all over his body, Gandy did not see anything to confirm these complaints.  (Id. at 27, 64.)  However, using her medical judgment, Gandy reasoned that Jones could have had kidney failure immediately prior to his incarceration "from drug overdose, toxins [and] could have been treated in the hospital and released and been stable enough to present" by the time of their meeting.  (Id. at 62:14-63:1.)  It was also her understanding that because Jones had stated that he had cancer and boils all over his body, including boils in his underarms, he could have been complaining about a condition known as hidradenitis, which is a "specific disease process where . . . the oil glands . . . erupt and form boils," and which can cause "tenderness in [the] axillary and . . . can come from overuse of deodorant."  (Id. at 63, 74:19-75.)  Thus, despite not being able to visually confirm Jones's complaints, Gandy did not believe that Jones was delusional because she thought that he may have been listing conditions that he had in the past or may simply have "overexaggerated."  (Id. at 64:7-65:2.)

Additionally, because Jones denied wanting to hurt himself or others, Gandy did not further ask mental health questions because "mental health [services would] ask those specific questions."

(Id. at 47:15-21.)  She similarly understood that she did not "need[] to do anything with his medication" for any mental health issues because mental health services would later see Jones and be the ones to order his psychotropic medication.  (Id. at 41:20-42:9.)  Moreover, Samuel had recommended that Jones did not need to be sent to the psychiatric ward at CFCF, and Gandy agreed, concluding that an Urgent Referral to MHM for mental health services would be sufficient to address Jones's mental health needs.  (Id. at 31:3-14, 71:11-16.)  Finally, based on Jones's averment that he had high blood pressure and Jones's medical chart from his prior stay at CFCF that revealed he was previously treated for high blood pressure, Gandy ordered blood pressure medication for Jones and determined that, based on Samuel's evaluation and her own meeting with Jones, there was no reason not to allow him to keep the 30-day supply of medication on his person. (Id. at 36:15-20, 42-44.)

Under these circumstances, even drawing all inferences in Plaintiff's favor, the evidence does not support a reasonable conclusion that Gandy was deliberately indifferent to Jones's serious mental health needs.  Rather, a reasonable jury could only conclude that Gandy exercised her professional judgment in giving Jones his blood pressure medication on a KOP basis and deciding not to send him to the psychiatric ward, based, among other things, on her observation that he was not delusional at the time of their meeting and her understanding that Jones's mental health condition would be further evaluated by mental health services.  While an argument could be made that Gandy was negligent in diagnosing and treating Jones, deliberate indifference requires more than just negligence or professional malpractice, and Plaintiff has simply failed to adduce evidence that could support a conclusion that Gandy was deliberately indifferent.  See Brown, 903 F.2d at 278; Green, 575 F. App'x at 48 (concluding that plaintiff who "alleged that the prison psychologist misdiagnosed his mental illnesses and did not provide adequate personal treatment" had failed to

establish deliberate indifference where he "receive[d] some amount of medical attention, and . . . merely disagree[d] with its type and quantity." (citation omitted)).

The record evidence also demonstrates that Jones received some psychiatric attention for his mental health condition from Defendants Cheryl Baldwin and Deborah Harris-White, the MHM social workers.  As described above, Jones was first seen by Baldwin on June 29, 2016 pursuant to the Urgent Referral scheduled during Jones's initial intake examination the previous day.  According to Baldwin, her role was to "determine if [Jones] was in extreme danger, . . . suicidal, [or] highly psychotic."  (Baldwin Dep. at 58:2-9.)  Baldwin observed Jones during this examination and noted that he "appeared oriented and manic."  (Pl.'s Ex. 27 at 7 of 40.)  Jones reported his history of schizoaffective disorder and the various psychotropic medications he had taken for his mental health condition.  (Id. at 5 of 40.)  Jones also told Baldwin that the psychotropic medication Zyprexa, "usually [helped him] with his episodes of paranoi[a] and sleep."  (Id.)  Baldwin further noted that Jones had expressed his willingness to continue receiving psychotropic medication and appeared motivated to continue mental health treatment.  (Id. at 7 of 40.)  Based on all of this information, Baldwin concluded that "[Jones did] not appear to be a danger to [him]self or others."  (Id.)  Baldwin referred Jones to a psychiatrist or psychiatric nurse practitioner and recorded that Jones was "educated on [his] current med[icine] bridge [for a 14-day prescription of Zyprexa] and plan for [a] routine [initial psychiatric evaluation]."  (Id.; Baldwin Dep. at 60:15-61:4.)

Jones was later seen by Harris-White on July 2, 2016 for an Emergency Referral, which had been scheduled because Jones was making "irrational statements" and had complained that he had not been receiving his psychotropic medication.  (Pl.'s Ex. 29 at 12, 14 of 40; JDA Ex. T at 1).  Harris-White questioned Jones, reviewed his most recent medical records, and made an

independent assessment of how he presented.  (Harris-White Dep. at 64:4-6; JDA Ex. T at 1-3.)
She observed that Jones "presented with a low affect"; was "oriented" as well as "very cooperative
and calm"; "appeared lucid and was able to engage in a logical and coherent conversation
regarding his [mental health] treatment"; was "concerned about the 'voices coming back'"; and
denied any prior or current suicidal behavior or ideation.  (JDA Ex. T at 1-2.)  Based on these
observations, Harris-White concluded that Jones had no immediate and acute mental health needs.
(Id. at 2-3.)  She also "contact[ed] medical . . . to inquire as to if [Jones] had been receiving his
medications," and she was able to confirm that Jones would get his psychotropic medication later
that day.  (Harris-White Dep. at 62:17-29; JDA Ex. T at 1.)

Under these circumstances, the evidence does not support a reasonable conclusion that
Baldwin or Harris-White were deliberately indifferent to Jones's mental health needs.  To the
contrary, a reasonable jury could only conclude that both Baldwin and Harris-White exercised
their professional judgment in treating Jones.  Specifically, a reasonable jury could only conclude
that Baldwin exercised her professional judgment in (1) determining, based on Jones's answers to
her questions and her observations, that Jones was not a danger to himself or others, (2) confirming
with Jones that he was comfortable taking Zyprexa to address his mental health condition, and (3)
referring Jones to a psychiatrist at CFCF to be further evaluated.  Likewise, a reasonable jury could
only conclude that Harris-White exercised her professional judgment in (1) determining, based on
Jones's answers to questions, his medical history, and her observations, that acute intervention was
unnecessary, and (2) making efforts to ensure that Jones would immediately receive his
psychotropic medication.[11]

---

[11] Plaintiff has submitted expert reports from Dr. Bonnie Nowakowski and Dr. Gregory
Brown.  Dr. Nowakowski opines in her report that "[t]he care rendered by [Gandy] was . . . a
deliberate failure to act."  (Pl.'s Ex. 3 at 38 of 41.)  Dr. Brown similarly opines in his report that

Plaintiff nevertheless argues that there is a genuine issue of material fact as to whether Gandy, Baldwin, and Harris-White were deliberately indifferent because they failed to examine select medical records that showed Jones had at times received medication on a No KOP (or DOT) basis during a previous stay at CFCF, and failed to contact Jones's probation officers for information about the severity of Jones's mental health condition.  However, Plaintiff cites no authority—and we are aware of no authority—for the proposition that a medical professional exercising professional judgment can be found to be deliberately indifferent to a patient's serious medical needs based solely on a failure to independently research the patient's medical history. Cf. Cohen v. Kids Peace Nat. Ctrs., Inc., 256 F. App'x 490, 492 (3d Cir. 2007) (stating that "the 'failure to access collateral sources of data [about the plaintiff's medical history]' could, at best, amount to simple negligence." (alteration in original) (quoting Doby v. DeCrescenzo, 171 F.3d 858, 876 (3d Cir. 1999))).  Moreover, even assuming arguendo that Gandy, Baldwin, and Harris-White were negligent in failing to review Plaintiff's prior records at CFCF and see that Plaintiff received certain medications on a DOT basis during a previous stay, such information would in no way undermine the fact that they exercised their professional judgment in concluding that Plaintiff

---

"MHM . . . act[ed] with deliberate indifference to the serious psychiatric needs of Mr. Jones." (Pl.'s Ex. 2 at 7.)  However, these statements are wholly conclusory.  Neither report denies that Gandy, Baldwin, and Harris-White made efforts to diagnose and treat Jones, or specifies how the Defendants' diagnoses and treatment decisions were not based on their professional judgment.  See Soto-Muniz, 665 F. App'x at 228.  Rather, both experts merely criticize Gandy, Baldwin, and Harris-White's failures to diagnose the severity of Jones's mental health condition and to administer recommended treatment.  We therefore conclude that the experts' opinions merely reflect their disagreement with Defendants' professional judgment and, thus, do not support a reasonable conclusion that Gandy, Baldwin, or Harris-White acted with the "obduracy and wantonness" required to establish deliberate indifference.  Id. (quotation omitted); cf. Pearson, 850 F.3d at 541 (denying summary judgment to defendant on plaintiff's deliberate indifference claim where defendant "refused to treat [the plaintiff] and . . . forced him [to] crawl to a wheelchair" (quotation omitted)).  Accordingly, to the extent that Plaintiff relies on these reports in support of her deliberate indifference claims, we find that reliance to be unavailing.

could receive his blood pressure medication on a KOP basis during his subsequent stay.   We therefore conclude that Plaintiff has failed to point to evidence that creates a genuine issue of material fact as to whether Gandy, Baldwin, or Harris-White were deliberately indifferent to Jones's serious medical needs.  Accordingly, we grant the Corizon and MHM Defendants' Motions for Summary Judgment insofar as they seek judgment in favor of Gandy, Baldwin, and Harris-White on Plaintiff's Section 1983 claim for deliberate indifference to Jones's serious medical needs in Count One.

## 2.   *Municipal Liability*

Counts One and Three assert Section 1983 claims against Corizon, MHM, and the City for deliberate indifference to Jones's serious medical needs for "creating a custom and pattern and practice" of providing inadequate medical treatment to its inmates.[12]  (2d Am. Compl. ¶¶ 63, 72, 76.)  A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  Rather, in order to prove a Section 1983 claim against a municipality, a plaintiff must demonstrate that her constitutional deprivations were caused by an official policy or custom of the municipality or a failure by the municipality to train its employees.  Id.; Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403 (1997); City of Canton v. Harris, 489 U.S. 378, 388 (1989).  A municipal policy is "a 'statement, ordinance, regulation, or decision officially adopted and promulgated by [a local

---

[12] Count Three also appears to assert a Section 1983 claim against the City based on a failure to train theory.  The City has moved for summary judgment as to Count Three with respect to the failure to train theory on the grounds that the undisputed record evidence demonstrates that the City properly trained its correctional officers in mental health and suicide prevention.  Plaintiff has failed to respond to this aspect of the City's argument and has accordingly pointed to no evidence in the record that could support a conclusion that the City was deliberately indifferent in failing to train its correctional officers.  We therefore grant the City's Motion for Summary Judgment insofar as it seeks judgment in favor of the City on Plaintiff's Section 1983 claim based on a failure to train theory.

governing] body's officers.'"   Simmons v. City of Philadelphia, 947 F.2d 1042, 1059 (3d Cir. 1991) (alteration in original) (quoting Monell, 436 U.S. at 690).  A custom, on the other hand, "is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'"   Natale, 318 F.3d at 584 (quoting Bryan Cty., 520 U.S. at 404).

Ultimately, then, to succeed on a claim of municipal liability brought pursuant to Section 1983, a plaintiff must first identify a municipal policy or custom that led to the alleged constitutional violation.  Bryan Cty., 520 U.S. at 397.  The plaintiff must then establish that the municipality maintained the policy or custom with "deliberate indifference" to the constitutional deprivations that the policy or custom caused.  See Beck v. City of Pittsburgh, 89 F.3d 966, 972 (3d Cir. 1996) (stating that "courts have adopted the 'deliberate indifference' standard in other policy and custom contexts" (citations omitted)).  Moreover, a private company like Corizon or MHM, which is acting under color of state law, can only be liable under § 1983 if it had a policy, practice or custom that resulted in the violation of constitutional rights.  See Natale, 318 F.3d at 583-84 (applying Monell standard to a private company that provides health services to CCCF inmates).

The Corizon Defendants, the MHM Defendants, and the City argue that Corizon, MHM, and the City are entitled to summary judgment in their favor as to Plaintiff's claim that they were deliberately indifferent to Jones's serious medical needs because there is no evidence that they enacted a policy or acquiesced in a long-standing custom that resulted in Jones's death.  Plaintiff clarifies in her Supplemental Memorandum that her claim is based not on an unconstitutional custom, but rather on an unconstitutional written medication policy at CFCF.

Under CFCF's medication policy, all medications prescribed at CFCF are to be dispensed by nursing staff either on a KOP or DOT basis.  (JDA Ex. AA at 2-3.)  Notably, blood pressure medication is not designated as DOT medication, and thus, the policy permits it to be dispensed on a KOP basis.  (See id. at 3.)  However, the policy expressly contemplates that medications that are not designated as DOT will be dispensed on a DOT basis when an inmate is determined to "have a propensity to abuse or misuse medication."  (Id.)  Plaintiff does not explain how this policy is constitutionally deficient or how it could have caused Jones's death or otherwise violated his Constitutional rights.  Indeed, the policy, on its face, was designed to prevent the harms that Jones suffered from ingesting multiple dose quantities of his blood pressure medication because it provides for administering the medication DOT where an inmate has "a propensity to abuse or misuse medication."  (Id.)  Thus, in the end, it is plain that Plaintiff's complaint is that no Corizon or MHM employee concluded that Jones had such a propensity, not that the policy itself was constitutionally deficient.  But Corizon, MHM, and the City "cannot be held liable under [Section] 1983 merely because the medical contractors at [CFCF] improperly prescribed [Jones] medication and failed to treat and monitor [his] symptoms thereafter, absent an unlawful policy or custom that caused [his] injuries."  Wehrli v. Allegheny Cty., Civ. A. No. 16-977, 2017 WL 1233619, at *8 (W.D. Pa. Apr. 4, 2017) (citing Monell, 436 U.S. at 694).  Accordingly, we grant the Corizon Defendants, the MHM Defendants, and the City's Motions for Summary Judgment insofar as they seek judgment in favor of Corizon, MHM, and the City on Plaintiff's Section 1983 municipal liability claim for deliberate indifference to Jones's serious medical needs in Counts One and Three.

C.  Section 1983 State-Created Danger Claims

Count Two of the Second Amended Complaint asserts a Section 1983 claim against Jones's probation officers, Browne and Palmer, for violation of Jones's due process rights under the Fourteenth Amendment under a theory that they created or enhanced the danger to Jones's life (a "state-created danger" theory).  According to the Second Amended Complaint, "Browne and Palmer subjected [Jones] to a state-created danger" by "imprisoning him in his fragile mental state" thereby "plac[ing] him at high risk of danger."  (2d Am. Compl. ¶ 27.)  The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV § 1.  The Clause is, however, "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989).  Accordingly, the Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means."  Id.

"The 'state-created danger' theory establishes liability where the 'state acts to create or enhance a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process.'"  Banegas v. Hampton, Civ. A. No. 08-5348, 2010 WL 3766460, at *5 (E.D. Pa. Aug. 31, 2010) (quoting Kniepp v. Tedder, 95 F.3d 1199, 1205 (3d Cir. 1999)).  To succeed on a claim pursuant to Section 1983 for a violation of the Fourteenth Amendment based on a "state-created danger" theory, a plaintiff must establish the following elements:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected

to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Bright v. Westmoreland Cty., 443 F.3d 276, 281 (3d Cir. 2006) (footnotes omitted) (internal quotations omitted).

Browne and Palmer argue, inter alia, that they are entitled to summary judgment in their favor as to Plaintiff's state-created danger claim because she cannot satisfy the second element of that claim, that their conduct shocked the conscience. They assert that the undisputed record evidence establishes that they believed, when they sought to have Jones arrested for violating his probation, that they were following APPD protocol, and that they were doing what was best for Jones. They further argue that there can be no genuine dispute that their decision to request a warrant was not conscious-shocking because Judge Minehart approved their warrant request to have Jones arrested.

The second element of the state-created danger theory "is often the most difficult for a plaintiff to show, and thus [the] ultimate conclusion frequently turns on [the] determination of whether given conduct 'shocks the conscience.'" Estate of Smith v. Marasco, 430 F.3d 140, 153 (3d Cir. 2005). "'[T]he exact degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances of a particular case.'" Id. (alteration in original) (quoting Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999)). Where officers have "the luxury of proceeding in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience." Id. (quotation omitted).

The pertinent record evidence, more fully described above, is that Plaintiff reached out to Browne, who was Jones's probation officer, for help convincing Jones to go to a psychiatric hospital. (Browne Dep. at 96:19-23.) Plaintiff told Browne that she wanted to involuntarily

28

commit Jones to the hospital herself but had been having difficulty.  (Id. at 116:22-119:7.)  Browne

asked Plaintiff to tell Jones to come to the probation office the next morning.  (Id. at 105:4-7.)  At

the probation office, Browne observed that Jones "wasn't stable," "displayed manic behavior, . . .

dr[ove] erratically . . . , was becoming aggressive . . . [,] [and was] not being coherent [or] making

sense."  (Id. at 132:9-10, 198:10-18.)  Browne also noted that Jones had arrived in a car that "was

basically not functiona[l]," and believed that Jones "could put other people [in] danger."  (Id. at

204:2-9.)  Browne was also "concerned about [Jones's] own safety."  (Id. at 216:12-16.)

Palmer, Browne's APPD supervisor at the time, corroborated Browne's observations.  She

testified at her deposition that Jones "was rambling incohesively [sic]," "had presented erratically

. . . [,] was extremely agitated, and . . . was determined to leave the State of Pennsylvania . . . [in]

an inoperable car."  (Palmer Dep. at 42:10, 49:5-23.)  Palmer also discovered that "[Jones] was in

technical violation" of his probation arising out of a prior arrest.  (Id. at 48:16-20.)  For all these

reasons, Palmer instructed Browne to fill out a warrant request form to have Jones detained.  (Id.

at 49:15-18; Browne Dep. at 170-172.)  Soon after, Judge Minehart approved the warrant request,

and Jones was arrested for violating his probation.  (JDA Ex. J; Pl.'s Ex. 22 at 5.)

Based on this evidence, which is not contradicted, no reasonable jury could conclude that

Browne and Palmer's conduct shocks the conscience.  The evidence clearly demonstrates that their

actions were designed to prevent Jones, who appeared mentally unstable, from driving out of state

in a potentially inoperable car and endangering himself and others.  Far from supporting a

reasonable conclusion that Browne and Palmer acted with a conscious-shocking disregard for

Jones's safety, the undisputed evidence demonstrates that Browne believed that sending Jones to

CFCF might help him because "his [medication would] be regulated," and a judge or prison official

could "find . . . a program" for him.  (Browne Dep. at 178:14-22.)  A reasonable jury also could

not conclude that Palmer acted in a conscious-shocking manner when she instructed Browne to apply for a warrant because Jones was in violation of his probation.  For all these reasons, we conclude that the record evidence cannot support a reasonable conclusion that Browne and Palmer acted with a conscience-shocking disregard for Jones's safety in satisfaction of the second element of a state-created danger claim.  See Grant v. Winik, 948 F. Supp. 2d 480, 510-11 (E.D. Pa. 2013) (granting the defendants' motion for summary judgment on state-created danger claim where the evidence demonstrated that the defendants "were concerned for [decedent's] safety . . . and did not harbor any ill will toward him.").  Accordingly, we grant Browne and Palmer's Motion for Summary Judgment insofar as it seeks judgment in favor of Browne and Palmer on Plaintiff's Section 1983 claim for the violation of Jones's Fourteenth Amendment rights based on a state-created danger theory in Count Two.

      D.  Section 1983 Equal Protection Claims

Count Two of the Second Amended Complaint asserts a Section 1983 claim against Browne and Palmer for violation of Jones's rights under the Equal Protection Clause of the Fourteenth Amendment for treating Jones "differently than other parolees by virtue of his mental disability," and for "work[ing] to imprison [Jones] in a situation where they would not have imprisoned a parolee not having a psychiatric disability."  (2d Am. Compl. ¶ 66.)  The Equal Protection Clause of the Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The United States Supreme Court has recognized that a successful equal protection claim may be brought by a "'class of one' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (citations omitted).  To succeed on a claim under

30

Section 1983 for denial of equal protection under a "class of one" theory, Plaintiff must prove that

"'(1) the defendant[s] treated him differently from others similarly situated, (2) the defendant[s]

did so intentionally, and (3) there was no rational basis for the difference in treatment.'" Phillips

ex rel. Estate of Phillips v. Nw. Reg'l Commc'ns, 391 F. App'x 160, 167 (3d Cir. 2010) (quoting

Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006)).   Discriminatory intent in this

context requires that a plaintiff produce evidence that "'the decisionmaker selected or reaffirmed

a particular course of action at least in part because of, not merely in spite of, its adverse effects.'"

Brown v. Friel, Civ. A. No. 16-1819, 2019 WL 4034684, at *10 (E.D. Pa. Aug. 26, 2019) (quoting

Jewish Home v. Ctrs. for Medicare & Medicaid Servs., 693 F.3d 359, 363 (3d Cir. 2012)).

Browne and Palmer argue that they are entitled to summary judgment in their favor as to

Plaintiff's "class of one" equal protection claim because she cannot satisfy any of the elements of

the claim.   Indeed, Plaintiff has not pointed to any record evidence, and we have not found any,

that demonstrates the existence of a genuine dispute as to any of the elements of a "class of one"

equal protection claim.   First, she does not "identify a similarly situated individual who was treated

differently" than Jones and has thus failed to satisfy the first element of a class of one equal

protection claim.   Mosca v. Cole, 217 F. App'x 158, 164 (3d Cir. 2007).   Second, Plaintiff has not

pointed to any evidence that supports a reasonable jury conclusion that either Browne or Palmer

intentionally discriminated against Plaintiff.   As explained at greater length in connection with the

Section 1983 state-created danger claims, the evidence is that when Jones arrived at the probation

office on June 28, 2016, Browne observed that Jones was manic, aggressive, and incoherent, and

she believed that Jones posed a danger to himself and others.   (Browne Dep. at 132, 198, 204.)

Likewise, she observed that Jones was "extremely agitated" and seemed "determined to leave the

State of Pennsylvania . . . [in] an inoperable car."   (Id. at 49:5-23.)   There is no evidence in the

record suggesting that Browne and Palmer had any motive aside from mitigating the danger that Jones appeared to pose to himself and others as a result of his mental health condition.  See Plaza at 835 W. Hamilton St. LP v. Allentown Neighborhood Improvement Zone Dev. Auth., Civ. A. No. 15-6616, 2017 WL 4049237, at *8 (E.D. Pa. Sept. 12, 2017) ("[T]o maintain an equal protection claim of this sort, [a plaintiff] must provide evidence of discriminatory purpose, not mere unequal treatment or adverse effect." (second alteration in original) (quoting Jewish Home, 693 F.3d at 363)).

Moreover, as to the third element of an equal protection claim, a reasonable jury could only conclude based on the evidence presented that Browne and Palmer's decision to obtain a warrant and detain Jones under these circumstances was rational given that they learned that Jones "was in technical violation [of his probation]."  (Palmer Dep. at 48:19-20.)  Ultimately, because Browne and Palmer's detention of Jones was pursuant to a valid bench warrant issued by the Philadelphia County Court of Common Pleas for a violation of probation (see JDA Ex. J), Plaintiff cannot show that the treatment Jones experienced was "'so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational.'"  Aulisio v. Chiampi, 765 F. App'x 760, 765 (3d Cir. 2019) (alterations in original) (quoting Warren v. City of Athens, 411 F.3d 697, 710-11 (6th Cir. 2005)).  In sum, we conclude that Plaintiff has failed to satisfy any element of a "class of one" equal protection claim, and we therefore grant Browne and Palmer's Motion for Summary Judgment insofar as it seeks judgment in favor of Browne and Palmer on Plaintiff's Section 1983 claim for violation of Jones's rights under the Equal Protection Clause of the Fourteenth Amendment in Count Two.

E.  Medical Malpractice and Negligence

Count One of the Second Amended Complaint asserts claims for medical malpractice and negligence against Gandy, Baldwin, and Harris-White under Pennsylvania common law for their allegedly negligent medical and psychiatric care of Jones.  To succeed on a medical malpractice claim, a plaintiff "is required to establish 'that 1) the medical practitioner owed a duty to [him]; 2) the practitioner breached that duty; 3) the breach was the proximate cause of, or a substantial factor in, bringing about the harm [that he suffered]; and 4) the damages suffered were the direct result of the harm.'"  Osborne v. Lewis, 59 A.3d 1109, 1114-15 (Pa. Super. Ct. 2012) (alterations in original) (quoting Carrozza v. Greenbaum, 866 A.2d 369, 379 (Pa. Super. Ct. 2004)).  Moreover, in "all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation."  Quinby v. Plumsteadville Family Practice, Inc., 907 A.2d 1061, 1070-71 (Pa. 2006) (citing Hightower-Warren v. Silk, 698 A.2d 52, 54 (Pa. 1997)).

The Corizon and MHM Defendants argue that Gandy, Baldwin, and Harris-White are entitled to summary judgment in their favor as to Plaintiff's medical malpractice claim because Plaintiff has not presented expert testimony that articulates the standard of care applicable to those Defendants and how they breached that standard.  The Corizon Defendants further contend that Plaintiff has failed to present expert evidence that Gandy's alleged breach caused substantial harm to Jones.

Plaintiff relies on the expert report of Dr. Bonnie Nowakowski to support her claim that Gandy was negligent in her medical treatment of Jones.  Dr. Nowakowski opines in her report that Gandy should have, but failed to, recognize that Jones suffered from acute delirium despite "clear[] . . . signs and symptoms consistent with an acute confusional state . . . ."  (Pl.'s Ex. 3 at 27-28, 37-

38 of 41.)  She points out that Jones "reported ongoing symptoms consistent with mania ('driving for days')," and that he "exhibited delirious beliefs at intake."  (Id. at 27 of 41.)  According to Dr. Nowakowski, because Gandy failed to recognize Jones's acute delirium, Jones was allowed to occupy a jail cell by himself with a large supply of blood pressure medication, which ultimately caused his suffering and death.  (See id. at 37-38 of 41.)

Although Dr. Nowakowski does not articulate the standard of care that Gandy breached in precise terms, we conclude that her conclusions, in substance, demonstrate that there is a genuine dispute as to whether Gandy's acts deviated from an acceptable medical standard of care and whether this breach caused Jones's death.  See Robinson v. Corizon Health Inc., Civ. A. No. 17-3868, 2019 WL 448900, at *11 (E.D. Pa. Feb. 5, 2019) ("[T]here are no magic words that an expert must use; it is 'the substance of their testimony [that] must be examined to determine whether the expert has met the requisite standard.'" (second alteration in original) (quoting Stimmler v. Chestnut Hill Hosp., 981 A.2d 145, 155 (Pa. 2009))).

Plaintiff relies on the expert report of Dr. Gregory Brown to support her claim that Baldwin and Harris-White were negligent in their psychiatric treatment of Jones.  In his report, Dr. Brown opines that: "[r]ecords from within the correctional facility indicated that it was clear [that Jones] had a diagnosis of Schizophrenia and/or Bipolar Disorder"; "Jones demonstrated delusional beliefs and stated [at intake] that he had cancer 'all over' his body, which was not factually accurate, thus evidence of psychosis in the form of delusions"; "[t]here was documentation on June 29, 2016 by [Baldwin] that [Jones] reported being awake several days straight driving a car[,] suggestive of a manic state"; "[h]e was documented as being 'oriented and manic[,]' suggesting the presence of ongoing psychiatric symptoms at the time of that evaluation"; and the medical evaluation performed on June 29, 2016 indicated that Jones appeared "over-anxious, panicked, afraid, or

angry, . . . suggesting elevated levels of agitation." (Pl.'s Ex. 2 at 19 of 41.) Dr. Brown also opines that:

> inadequate appreciation of ongoing psychosis, inadequate dosage of prescribed medication for psychosis, lack of transfer to a psychiatric ward (especially based upon concerns from probation), and the capacity for him to keep medicine on his person, all of which fell below a reasonable standard of care, in my professional opinion[,] . . . likely led to Mr. Jones' unfortunate death.

(Pl.'s Ex. 2 at 20 of 41.)

Although Dr. Brown does not precisely articulate the standard of care that he believes Baldwin and Harris-White breached, we conclude that the substance of Dr. Brown's report also demonstrates the existence of a genuine dispute as to whether Baldwin and Harris-White deviated from an acceptable psychiatric standard of care. See Robinson, 2019 WL 448900, at *11. Accordingly, we deny the Corizon and MHM Defendants' Motions for Summary Judgment insofar as they seek judgment in favor of Gandy, Baldwin, and Harris-White on Plaintiff's medical malpractice and negligence claims in Count One.

F. Corporate Negligence

Count One of the Second Amended Complaint asserts a negligence claim against Corizon and MHM under Pennsylvania common law for failing "to provide [a] reasonably safe environment and to take reasonable steps to eliminate and decrease hazards and dangerous conditions for those in [Jones's] position." (2d Am. Compl. ¶¶ 58, 63.) "'Corporate negligence [in a medical care context] is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed [to] the patient, which is to ensure the patient's safety and well-being while at the hospital.'" Welsh v. Bulger, 698 A.2d 581, 585 (Pa. 1997) (quoting Thompson v. Nason Hosp., 591 A.2d 703, 707 (Pa. 1991)); see also Fox v. Horn, Civ. A. No. 98-5279, 2000 WL 49374, at *8 (E.D. Pa. Jan. 21, 2000) (concluding that the Pennsylvania Supreme Court would

decide that organizations that "contract[] to provide medical services to state inmates, can be held liable under the theory of corporate negligence"). "'Because the duty to uphold the proper standard of care runs directly from the hospital to the patient, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action in corporate negligence.'" Welsh, 698 A.2d at 585 (quoting Moser v. Heistand, 681 A.2d 1322, 1325 (Pa. 1996)). "A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees. Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts." Id. (citation omitted). However, "unless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff." Id.; see also Fox, 2000 WL 49374, at *8 ("Just as it must be presented to support a claim of medical malpractice, expert testimony is required to demonstrate corporate negligence." (citation omitted)).

The Corizon and MHM Defendants argue that Corizon and MHM are entitled to summary judgment in their favor as to Plaintiff's corporate negligence claim in Count One because Plaintiff's expert reports fail to articulate a standard of care that Corizon and MHM breached. The Corizon Defendants further contend that Plaintiff has failed to present expert evidence that Corizon's alleged breach caused substantial harm to Jones.

Plaintiff relies on the expert report of Dr. Nowakowski to support her claim that Corizon was negligent in its medical treatment of Jones. Dr. Nowakowski opines in her report that Corizon deviated from the applicable standard of care by failing to perform an accurate medication reconciliation on admission and by failing to recognize that Jones suffered from delirium based on the symptoms he exhibited at intake. (Pl.'s Ex. 3 at 37-38 of 41.) Dr. Nowakowski further opines

36

that Corizon's failure to recognize Jones's delirium caused his death because he was given "a large supply of medication to hold on his person while alone in a general population cell while in a state of delirium." (Id. 38 of 41.) Drawing all reasonable inferences in Plaintiff's favor, we conclude that Dr. Nowakowski's opinion constitutes evidence that Corizon failed to have reasonable policies in place to ensure that inmates exhibiting symptoms of an acute mental illness would be given proper mental health treatment, and that this failure caused Jones's death. See Hernandez-Anguera v. Main Line Hosps., Inc., Civ. A. No. 12-6645, 2014 WL 12605468, at *4 (E.D. Pa. Apr. 10, 2014) ("Although no expert explained what the institution should have done in fine-grained detail, all three reports suggest that it should have had a policy or supervision mechanism in place to ensure that a post-partum woman presenting with [the plaintiff's] symptoms would be immediately treated for preeclampsia."); see also id. at *1 ("Experts need not use 'magic words;' it is the substance of their testimony that matters." (quoting Welsh, 698 A.2d at 586)).

The Corizon Defendants focus on Dr. Nowakowski's opinion that "no Philadelphia Prison System (PPS), American Correctional Association (ACA) or National Commission on Correctional Health Care (NCCHC) written policy, procedure or standard was violated" and argue that this aspect of Dr. Nowakowski's report establishes that Corizon was not negligent. (Pl.'s Ex. 3 at 27 of 41.) However, construing Dr. Nowakowski's report in the light most favorable to Plaintiff, Dr. Nowakowski's conclusion that no correctional standard was violated is not a determination that Corizon's policies were reasonable; rather, we understand her conclusion to be that Corizon was negligent in spite of having complied with these correctional standards. See Hernandez-Anguera, 2014 WL 12605468, at *4 ("[G]iven that Nurse Tallman allegedly did comply with hospital policy for blood pressure reporting, the expert conclusion that her actions deviated from the relevant standard of care is, by implication, a criticism of the hospital policy as

well.").   Furthermore, the Corizon Defendants cite no case that supports the proposition that compliance with correctional standards is a full defense to a corporate negligence claim.   We therefore conclude that based on Dr. Nowakowski's expert testimony, Plaintiff has demonstrated the existence of a genuine dispute as to whether Corizon, through its policy, actions, or inactions, breached a standard of care for treating inmates like Jones and whether that breach caused substantial harm to Jones.

Plaintiff relies on the expert report of Dr. Brown to support her claim that MHM was negligent in its psychiatric treatment of Jones.   Dr. Brown opines in his report that given the "totality of information available for Mr. Jones in the correctional system of Philadelphia, he was well regarded as having a severe mental illness."   (Pl.'s Ex. 2 at 6.)   According to Dr. Brown, it "was clearly documented" that Jones had "acute psychotic features and [was] even noted to be acutely manic by [Baldwin] when [he was] evaluated on June 29, 2016."   (Id.)   Dr. Brown opines that MHM's "inadequate appreciation of [Jones's] ongoing psychosis, inadequate dosage of prescribed medication for psychosis, lack of transfer to a psychiatric ward . . . , and [permitting Jones] to keep medicine on his person, all . . . fell below a reasonable standard of care."   (Id. at 7.) Drawing all reasonable inferences in Plaintiff's favor, we find that Dr. Brown's opinion constitutes evidence that MHM failed to have reasonable policies in place to adequately treat Jones for his mental illness.   We thus further conclude that based on Dr. Brown's expert testimony, Plaintiff has demonstrated the existence of a genuine dispute as to whether MHM, through its policy, actions, or inactions, breached a standard of care for treating inmates like Jones.   Accordingly, we deny the Corizon and MHM Defendants' Motions for Summary Judgment insofar as they seek judgment in favor of Corizon and MHM on Plaintiff's corporate negligence claim in Count One.

G.  Intentional Infliction of Emotional Distress

Count One of the Second Amended Complaint asserts a claim for intentional infliction of emotional distress against the Corizon and MHM Defendants for their "outrageous and reckless acts of giving [Jones] the means and opportunity to overdose and die," which "intentionally or recklessly caus[ed] [Jones] severe emotional distress . . . including highly unpleasant mental reactions." (2d Am. Compl. ¶¶ 61-63.)  To prevail on a claim for intentional infliction of emotional distress under Pennsylvania law, Plaintiff must "'demonstrate intentional[,] outrageous[,] or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff.'"  Reedy v. Evanson, 615 F.3d 197, 231 (3d Cir. 2010) (quoting Swisher v. Pitz, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)).  The defendant's conduct "'must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'"  Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998) (quoting Buczek v. First Nat'l Bank, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).  Thus, it is not sufficient to show "'that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.'"  Id. (quoting Restatement (Second) of Torts § 46, cmt. d) (additional citation omitted).

The Corizon and MHM Defendants argue that they are entitled to summary judgment in their favor as to Plaintiff's intentional infliction of emotional distress claim because Plaintiff has not submitted evidence on which a reasonable jury could base a conclusion that they engaged in any intentional outrageous or extreme conduct.  Conversely, Plaintiff maintains that the same

evidence that supports her deliberate indifference claim demonstrates a genuine dispute of material fact as to her intentional infliction of emotional distress claim.

As we discussed earlier in connection with the Section 1983 deliberate indifference claims, the evidentiary record shows that Gandy, Baldwin, and Harris-White made efforts to evaluate Jones's physical and mental health condition and provide him with the appropriate medical care. Thus, the record belies any claim that the Corizon and MHM Defendants engaged in any outrageous or extreme conduct. See Charleston v. Corizon Health, Inc., Civ. A. No. 17-3039, 2018 WL 1757606, at *22 (E.D. Pa. Apr. 12, 2018) (granting motion for summary judgment as to plaintiff's intentional infliction of emotional distress claim where there was no evidence that Corizon "outright refus[ed] to provide medical care" and plaintiff was simply "challeng[ing] the adequacy of his medical care"); Wilson v. Jin, 698 F. App'x. 667, 673 (3d Cir. 2007) ("We agree with the District Court that the medical defendants' actions were not beyond all possible bounds of decency so as to be regarded as atrocious. . . .  While he may disagree with the treatment he was provided, this does not render the medical defendants' conduct outrageous or extreme.").

Although Plaintiff argues that the Corizon and MHM Defendants engaged in outrageous or extreme conduct because they allowed Jones to keep a 30-day pack of blood pressure medication on his person despite his history of overdosing on pills, the record evidence shows that Jones last overdosed on pills 20 years ago in 1996 (see Pl.'s Ex. 8 at 30 of 31), and there is no evidence that anyone at Corizon or MHM either knew of his overdose history at the time his blood pressure medication was ordered or otherwise believed that there was a substantial risk that Jones would overdose on this medication.[13]  See Martin v. City of Philadelphia, Civ. A. No. 99-543, 2000 WL

---

[13] Notably, a couple of weeks before being detained at CFCF on June 28, 2016, Jones voluntarily committed himself into Friends Hospital and was found, on examination, to have had a plan to overdose on pills.  (Pl.'s Ex. 21 at 1.)  The hospital released him a week later after

1052150, at *14 (E.D. Pa. July 24, 2000) (granting the defendant's motion for summary judgment on intentional infliction of emotional distress claim because there was "no evidence that [the defendant] took any action indicating either that he desired to bring about the conduct at issue in this case or that he was aware that such conduct was substantially certain to follow"). We therefore conclude that none of the Corizon or MHM Defendants' actions were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Hoy, 720 A.2d at 754 (quotation omitted). Accordingly, we grant the Corizon and MHM Defendants' Motions for Summary Judgment insofar as they seek judgment in favor of the Corizon and MHM Defendants on Plaintiff's intentional infliction of emotional distress claim in Count One.

H. State Law Claims Against Browne and Palmer

Counts Two, Four, and Five of the Second Amended Complaint assert claims under Pennsylvania law against Browne and Palmer for false arrest, false imprisonment, malicious prosecution, abuse of process, and intentional infliction of emotional distress, and claims against Browne and Palmer under Pennsylvania's Wrongful Death and Survival Acts. Browne and Palmer maintain that they are entitled to summary judgment as to all of these claims because they are immune from suit pursuant to Pennsylvania's sovereign immunity doctrine.

The doctrine of sovereign immunity, codified at 1 Pa. Cons. Stat. Ann. § 2310, provides that officials and employees of the Commonwealth, "acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except

---

determining that Jones was stable for discharge once he had denied all suicidal and homicidal ideations, and psychiatric and physical symptoms. (Id. at 2.) Although Gandy requested release of these records from Friends hospital, she testified that she did not know whether they were ever received at CFCF. (Gandy Dep. at 38:3-16.) Thus, there is no evidence that anyone at Corizon or MHM was aware that Friends Hospital had noted that Jones reported a plan to overdose on pills.

as the General Assembly shall specifically waive the immunity."  Id.  "Sovereign immunity 'protects the Commonwealth and Commonwealth parties from suit unless the cause of action falls within one of several statutory exceptions, or the individual's conduct falls outside the scope of his employment.'"  Bolden v. Pa. Bureau of Prisons, Civ. A. No. 11-0467, 2011 WL 4974489, at *4 (E.D. Pa. Oct. 19, 2011) (quoting Wesley v. Hollis, Civ. A. No. 03-3130, 2007 WL 1655483, at *14 (E.D. Pa. June 6, 2007)).

Browne and Palmer argue that they are protected by sovereign immunity because they were employees of the Commonwealth of Pennsylvania acting within the scope of their employment when they interacted with Jones.  Plaintiff first argues that Browne and Palmer may not take advantage of the sovereign immunity doctrine because they were employees of the City of Philadelphia, not the Commonwealth of Pennsylvania.  However, the undisputed evidence is that Browne and Palmer were probation officers working for APPD at all relevant times.  (See Browne Dep. at 42:15-17; Palmer Dep. at 18:6-11.)  APPD is "an arm of the state, and its employees are state actors, making them subject to sovereign immunity."  Johnson v. City of Philadelphia, Civ. A. No. 13-02963, 2013 WL 4014565, at *6 (E.D. Pa. Aug. 7, 2013) (quotation omitted); see also Haybarger v. Lawrence Cty. Adult Prob. & Parole, 551 F.3d 193, 198 (3d Cir. 2008) (stating that "Pennsylvania's judicial districts, including their probation and parole departments . . . are part of the Commonwealth government rather than local entities."  (citation omitted).  We therefore conclude that Browne and Palmer were Commonwealth employees rather than City employees and may therefore assert immunity under Pennsylvania's sovereign immunity doctrine.

Plaintiff next argues that Browne and Palmer are not protected by sovereign immunity because they were acting outside the scope of their employment when they "[sent] . . . Jones to prison to get psychiatric care" because probation officers "do not provide therapy or determine

what is the best psychiatric care for a parolee." (Opp. at 32.) According to the Restatement (Second) of Agency, an employee's conduct is within the scope of his or her employment "'only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master.'" Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000) (alterations in original) (quoting Restatement (Second) of Agency § 228). Actions that are not authorized by the employer may still be within the scope of employment "if they are clearly incidental to the master's business." Shuman Estate v. Weber, 419 A.2d 169, 173 (Pa. Super. Ct. 1980) (citations omitted).

Plaintiff does not dispute that Browne and Palmer's actions occurred substantially within the authorized time and space limits of their employment, but she argues that Browne and Palmer cannot satisfy the first and third elements of the test set out above. However, as probation officers, Browne and Palmer's submission of a warrant request form to have Jones arrested because he was in technical violation of his probation falls squarely within the types of conduct that they were hired to perform. (Browne Dep. at 155:13-18; Palmer Dep. at 48:16-20.) Furthermore, the evidence is undisputed that Browne and Palmer's conduct was actuated, at least in part, by a purpose to serve APPD. Indeed, Palmer testified that she made the decision to submit a warrant request to detain Jones for a combination of reasons, including that Jones "was in technical violation" of his probation, "was rambling incohesively [sic]," and "had presented erratically . . . [,] was extremely agitated, and . . . was determined to leave the State of Pennsylvania . . . [in] an inoperable car." (Palmer Dep. at 42:10, 48:19-20, 49:5-23.) Moreover, Browne stated in her deposition that she prepared the warrant request form because Palmer, her supervisor, had instructed her to do so. (Browne Dep. at 170:17-22.) None of this evidence suggests that either Browne or Palmer had a personal motive for deciding to apply for a warrant to have Jones arrested;

the undisputed evidence, rather, conclusively demonstrates that Palmer and Browne's decisions were motivated, at least in part, to fulfill their duties as employees of APPD.  See Robus v. Pa. Dep't of Corrs., Civ. A. No. 04-2175, 2006 WL 2060615 at *9 (E.D. Pa. July 20, 2006) ("Nothing . . . suggests that [the defendants] had a personal motive for their actions.  Thus, it would appear that their actions were motivated, at least in part and perhaps in whole, to serve the employer.").

We therefore conclude that Plaintiff has not demonstrated the existence of a genuine dispute as to whether Browne and Palmer were acting within the scope of their employment when they submitted a warrant request form seeking Jones's arrest for violating the terms of his probation.  We therefore further conclude that Browne and Palmer are protected by state sovereign immunity, under 1 Pa. Cons. Stat. Ann. § 2310, against Plaintiff's claims for false arrest, false imprisonment, malicious prosecution, abuse of process, and intentional infliction of emotional distress, and Plaintiff's Wrongful Death and Survival Act claims.  Accordingly, we grant Browne and Palmer's Motion for Summary Judgment insofar as it seeks judgment in favor of Browne and Palmer as to these claims in Counts Two, Four, and Five.[14]

---

[14] Plaintiff contends that sovereign immunity does not apply here because Browne and Palmer, "by falsely arresting and imprisoning [Jones], committed willful misconduct, which is one of the exceptions to state [sovereign] immunity."  (Opp. at 32 (referencing 42 Pa. Cons. Stat. Ann. § 8550).)  However, the "willful misconduct" exception to sovereign immunity on which Plaintiff relies is found in 42 Pa. Cons. Stat. Ann. § 8550, which applies only to local, not Commonwealth, governmental agencies and employees.  Johnson, 2013 WL 4014565, at *6 n.8 (citing 42 Pa. Cons. Stat. Ann. § 8541).  As discussed above, Browne and Palmer are Commonwealth employees; thus, they are not subject to the willful misconduct exception.  See id. at *6 ("Unlike the immunity afforded to local government agencies . . . [w]illful misconduct does not vitiate a Commonwealth employee's immunity if the employee is acting within the scope of his employment." (second alteration in original) (quotation omitted)).  We therefore reject Plaintiff's contention that the willful misconduct exception to sovereign immunity contained in 42 Pa. Cons. Stat. Ann. § 8522(a) applies here.

I.   <u>Wrongful Death and Survival Act Claims</u>

Counts Four and Five of the Second Amended Complaint assert claims under the Pennsylvania Wrongful Death Act, 42 Pa. Cons. Stat. Ann. § 8301, and Survival Act, 42 Pa. Cons. Stat. Ann. § 8302, against the Corizon Defendants, the MHM Defendants, and the City.  Under the Wrongful Death Act, a plaintiff can bring an action "to recover damages for the death of an individual caused by the wrongful act . . . of another . . . ."  42 Pa. Cons. Stat. Ann. § 8301(a). Under the Survival Act, a cause of action "survive[s] the death of the plaintiff."  <u>Id.</u> § 8302. However, "'wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death.'" <u>Johnson v. City of Philadelphia</u>, 105 F. Supp. 3d 474, 483 (E.D. Pa. 2015) (quoting <u>Sullivan v. Warminster Twp.</u>, 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011)) (additional citations omitted), <u>aff'd</u>, 837 F.3d 343 (3d Cir. 2016).

The City argues that it is entitled to summary judgment in its favor on Plaintiff's Wrongful Death and Survival Act claims because Plaintiff's underlying causes of action are not viable.[15]  As the City contends, a "plaintiff's Wrongful Death Act and Survival Act claims must fall [if the plaintiff has not] adduced evidence of a viable claim on one or more of the underlying causes of action."  <u>Johnson</u>, 105 F. Supp. 3d at 483.  As discussed above, Plaintiff has failed to adduce sufficient evidence to support the following claims: the Section 504 claims against Corizon, MHM, and the City based on discrimination against Jones's disability in Counts One and Three (<u>see</u> Section III.A); the Section 1983 claims against the Corizon Defendants, the MHM Defendants, and the City based on deliberate indifference to Jones's serious medical needs in Counts One and

_____

[15] The Corizon and MHM Defendants state in their briefs that they are moving for summary judgment on all of Plaintiff's claims, but they do not advance any arguments specific to the Wrongful Death and Survival Act claims in Counts Four or Five.

Three (see Section III.B); and the intentional infliction of emotional distress claims against the Corizon and MHM Defendants in Count One (see Section III.G). We therefore conclude that these claims are not viable underlying causes of action for Plaintiff's Wrongful Death and Survival Act claims against the Corizon Defendants, the MHM Defendants, and the City. Accordingly, we grant the Corizon Defendants, the MHM Defendants, and the City's Motions for Summary Judgment insofar as they seek judgment in favor of the Corizon Defendants, the MHM Defendants, and the City on Plaintiff's Wrongful Death and Survival Act claims based on those underlying causes of action. In contrast, we deny the Corizon and MHM Defendants' Motions for Summary Judgment insofar as they seek judgment in favor of the Corizon and MHM Defendants on Plaintiff's Wrongful Death and Survival Act claims that are based on the medical malpractice and corporate negligence claims against them in Count One (see Sections III.E-F), because we have concluded that those underlying claims are viable causes of action.

J.   Punitive Damages

Plaintiff seeks punitive damages against all Defendants in connection with the claims she asserts in Counts One through Five "on the grounds that the acts and omissions of [D]efendants were willful, wanton, malicious, deliberate, recklessly indifferent and shocking to the conscience." (2d Am. Compl. ¶ 50.) "In Pennsylvania as elsewhere, '[t]he state of mind of the actor is vital' in determining whether punitive damages may be awarded.'" Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc., 801 F.3d 347, 360 (3d Cir. 2015) (alteration in original) (quoting Feld v. Merriam, 485 A.2d 742, 748 (Pa. 1984)). "'Ordinary negligence . . . will not support an award of punitive damages. Rather, to justify an award of punitive damages, the fact-finder must determine that the defendant acted with a culpable state of mind, i.e., with evil motive or reckless indifference to the rights of others.'" Id. (alteration in original) (quoting Hutchinson v. Penske

Truck Leasing Co., 876 A.2d 978, 983-84 (Pa. Super. Ct. 2005)).  "This standard is disjunctive, so the defendant's conduct need only be reckless or callous."  Langweiler v. Borough of Newtown, Civ. A. No. 10-3210, 2010 WL 5393529, at *3 (E.D. Pa. Dec. 29, 2010) (citing Springer v. Henry, 435 F.3d 268, 281 (3d Cir. 2006)).  At a minimum, therefore, a plaintiff must adduce evidence of a defendant's reckless indifference by submitting evidence that "'(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk.'"  Brand Mktg. Grp., 801 F.3d at 360 (quoting Hutchison ex rel. Hutchinson v. Luddy, 870 A.2d 766, 772 (Pa. 2005)).

All of the Defendants, with the exception of the City,[16] argue that they are entitled to summary judgment in their favor as to Plaintiff's claim for punitive damages because the record is devoid of any evidence of evil motive or intent, reckless or callous indifference to Plaintiff's rights, or outrageous conduct by any of the Defendants.  Plaintiff argues that we should deny the Defendants' Motions with regard to her claim for punitive damages because "[t]he facts supporting a deliberate indifference claim and an infliction of emotional distress claim also support a punitive damages award."  (Opp. at 25.)

"'[D]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'"  Morris v. Levi, Civ. A. No. 08-3842, 2011 WL 1936778, at *8 (E.D. Pa. Apr. 21, 2011) (quoting Farmer v. Brennan, 511 U.S. 825, 836-37

---

[16] The City argues that any claim for punitive damages against it should be dismissed because punitive damages "may not be imposed on municipalities, or other government agencies, even with a showing of reckless disregard."  (City Mem. at 18.)  During a telephone conference held with the parties on May 29, 2020, Plaintiff's counsel conceded that municipalities cannot be held liable for punitive damages, and that Plaintiff's claims for punitive damages against the City should therefore be dismissed.  Accordingly, we grant the City's Motion for Summary Judgment insofar as it seeks judgment in favor of the City on Plaintiff's claim for punitive damages in Counts Three through Five.

(1994)).  We have concluded that Plaintiff has failed to submit evidence that would allow a reasonable jury to find that any of the Defendants were deliberately indifferent to Jones's serious medical needs.  (See Sections III.B-C.)  For those same reasons, we conclude that Plaintiff has failed to submit evidence that would allow a reasonable jury to find that any of the Defendants acted with reckless indifference to Jones's serious medical needs.  See Wichterman v. City of Philadelphia, Civ. A. No. 16-5796, 2019 WL 3216609, at *13 (E.D. Pa. July 17, 2019) (denying summary judgment as to the plaintiff's punitive damages claim because "[t]he Court ruled . . . that no reasonable jury could find that [the defendant] was deliberately indifferent to [the plaintiff's] serious medical condition").  As a result, Plaintiff is not entitled to punitive damages in connection with any of her claims.  Accordingly, we grant the Defendants' Motions for Summary Judgment insofar as they seek judgment in Defendants' favor on Plaintiff's claim for punitive damages in Counts One through Five.

K.  Economic Loss Damages

Plaintiff seeks damages against all Defendants for "loss of future earnings, economic losses, loss of earning capacity and other financial and personal damages" under the Wrongful Death Act claim in Count Four of the Second Amended Complaint.  (2d Am. Compl. ¶¶ 79, 82.) "Pennsylvania law 'does not require that proof in support of claims for damages or in support of claims for compensation must conform to the standard of mathematical exactness.'"  Adams v. Rossi, 29 Pa. D. & C.4th 511, 520 (Com. Pl. 1995) (quoting Blackburn v. Aetna Freight Lines, Inc., 368 F.2d 345, 347 (3d Cir. 1966)), aff'd sub nom., Stewart v. Rossi, 681 A.2d 214 (Pa. Super. Ct. 1996).  However, the law does require that a "'claim for damages must be supported by a reasonable basis for calculation; mere guess or speculation is not enough.'"  Sweitzer v. Oxmaster,

Inc., Civ. A. No. 09-5606, 2011 WL 721907, at *6 (E.D. Pa. Mar. 2, 2011) (quoting Stevenson v. Econ. Bank, 197 A.2d 721, 727 (Pa. 1964)).

Defendants argue that they are entitled to summary judgment in their favor as to Plaintiff's claim for economic loss damages because Plaintiff has produced no evidence of Jones's prior earnings, projections of lost future earnings, or loss of earning capacity as a part of either fact or expert discovery.  However, Plaintiff has stated in her answers to interrogatories that "[Jones] was a hard worker and made income and continued to work through his life," and that "[Jones] also received social security benefits."  (JDA Ex. GG at 1.)  Plaintiff also testified that Jones spent two years with Job Corps, worked at various fast-food restaurants, and had periodic employment as an auto-mechanic.  (Plaintiff Dep. at 84:8-19.)  Plaintiff's responses to interrogatories show that Jones had a history of gainful employment and received benefits, which would allow a reasonable jury to find that Jones lost his earning capacity and suffered a loss of future earnings upon his death. We also conclude that this evidence, recounting the kinds of employment and benefits Jones had in the past, though lacking in mathematical exactness, provides a reasonable basis for calculating the value of Plaintiff's economic loss damages.  See Adams, 29 Pa. D. & C.4th at 520.  As a result, we conclude that at this stage in the proceedings, Plaintiff has submitted enough evidence to demonstrate the existence of a genuine dispute as to whether she is entitled to economic loss damages.  Accordingly, we deny the Corizon and MHM Defendants' Motions for Summary Judgment insofar as they seek judgment in favor of the Corizon and MHM Defendants on Plaintiff's claim for economic loss damages in Count Four.  However, because we have granted summary judgment in favor of Browne, Palmer, and the City on all of Plaintiff's substantive claims, we must also grant the Motions for Summary Judgment filed by Browne and Palmer, and the City on Plaintiff's derivative claim for economic loss damages.

IV.     **CONCLUSION**

For the reasons stated above, we grant the Motions for Summary Judgment as to: (1) the Section 504 discrimination claims asserted against Corizon, MHM, and the City in Counts One and Three; (2) the Section 1983 claims asserted against the Corizon Defendants, the MHM Defendants, and the City based on deliberate indifference to Jones's serious medical needs in violation of Jones's Eighth and Fourteenth Amendment rights in Counts One and Three; (3) the Section 1983 claims asserted against Browne and Palmer for violation of Jones's Fourteenth Amendment substantive due process rights based on a state-created danger theory in Count Two; (4) the Section 1983 claims asserted against Browne and Palmer based on a violation of Jones's Fourteenth Amendment right to equal protection in Count Two; (5) the intentional infliction of emotional distress claims asserted against the Corizon and MHM Defendants in Count One; (6) the false arrest, false imprisonment, malicious prosecution, abuse of process, and intentional infliction of emotional distress claims asserted against Browne and Palmer in Count Two; (7) the Wrongful Death and Survival Act claims brought against all Defendants in Counts Four and Five insofar as they are based on the foregoing claims in this paragraph; (8) the claim for punitive damages asserted against all Defendants in Counts One through Five; and (9) the claim for economic loss damages asserted against Browne and Palmer, and the City in Count Four.

We deny the Motions for Summary Judgment as to: (1) the claims for medical malpractice and corporate negligence asserted against the Corizon and MHM Defendants in Count One; (2) the Wrongful Death and Survival Act claims brought against the Corizon and MHM Defendants in Counts Four and Five insofar as they are based on the foregoing medical malpractice and corporate negligence claims; and (3) the claim for economic loss damages asserted against the Corizon and MHM Defendants in Count Four.

An appropriate Order follows.


BY THE COURT:


/s/ John R. Padova
John R. Padova, J.